**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
(SOUTHERN DIVISION)**

| | | |
|---|---|---|
| **DOUBLEVERIFY HOLDINGS INC.** (a corporation with a principal place of business at 28 Crosby Street, 6th Floor, New York, NY, 10013), and **DOUBLEVERIFY INC.** (a corporation with a principal place of business at 28 Crosby Street, 6th Floor, New York, NY, 10013),<br><br>　　　*Plaintiffs*,<br><br>v.<br><br>**ADALYTICS RESEARCH, LLC** (a limited liability company residing at 267 Kentlands Boulevard #87628, Gaithersburg, Montgomery County, MD, 20878).<br><br>　　　*Defendant*. | § § § § § § § § § § § § § § § | Civil Action No. 8:25-cv-1535<br><br>JURY TRIAL DEMANDED |

## ORIGINAL COMPLAINT

Plaintiffs DoubleVerify Holdings Inc. and DoubleVerify Inc. (together, "**DoubleVerify**" or "**Plaintiffs**"), by and through their undersigned attorneys, file this Original Complaint (the "**Complaint**") against Defendant Adalytics Research, LLC ("**Adalytics**"), and allege, on knowledge as to their own actions, and otherwise upon information and belief, as follows:

### PRELIMINARY STATEMENT

1.　　DoubleVerify brings this action to hold Adalytics accountable for its malicious publication and commercial exploitation of misleading, disparaging, defamatory, and false statements concerning DoubleVerify and its business. These statements by Adalytics—including those contained in an article published on Adalytics' website on March 28, 2025 (the "**Article**")—

falsely assert and imply that DoubleVerify's services are ineffective and that DoubleVerify's customers routinely pay for advertising impressions that are served to robotic agents ("**bots**"), referred to as invalid traffic ("**IVT**"), rather than to genuine human consumers.

2.     In reality, DoubleVerify employs a robust dual-layered system that provides effective protection to its customers from paying for advertising impressions generated by bots. Upstream, DoubleVerify prevents the overwhelming majority of its customers' advertisements from being served to webpage visitors identified as general IVT ("**GIVT**") and sophisticated IVT ("**SIVT**").  Downstream, DoubleVerify identifies IVT and flags impressions served to bots by (1) deducting impressions served to GIVT from the billable count (*i.e.*, the number of impressions for which an advertiser is charged) *before* a customer is billed and (2) identifying to advertisers those impressions served to SIVT (for which the advertiser can then seek compensation from the seller of the ad placement), each as consistent with industry standards.

3.     In every example cited by Adalytics in its Article as purported evidence of failure for which DoubleVerify was able to identify the impression from its records, DoubleVerify has confirmed that it detected the invalid impression downstream and therefore ensured the impressions served to GIVT were removed from the customer's billable impression count and, in the case of SIVT, were properly flagged to customers.

4.     DoubleVerify's approach is fully aligned with best practices and industry guidance, including as provided by leading industry bodies, including the Media Rating Council ("**MRC**"), a media industry self-regulatory body that was established at the request of Congress and that audits and accredits measurement products and data sources; the Trustworthy Accountability Group ("**TAG**"), an initiative fighting criminal activity in the online advertising industry; and the Interactive Advertising Bureau ("**IAB**"), an organization that develops standards for the online

advertising industry. IVT solutions of DoubleVerify are accredited by MRC and audits are performed annually by an independent third party for these accreditations, which includes confirming that the solutions comply with IAB and TAG guidelines.

5.      DoubleVerify processes and analyzes an astounding volume of online advertising data every day. On average, DoubleVerify analyzes **over 300,000** advertisement transactions (such as impressions, clicks, and conversions) **every second**—nearly **10 trillion** transactions per year. It is an industry leader in protecting advertisers against both fraud and waste and has been doing so for almost two decades.

6.      Adalytics, for its part, is an unaccredited and unaudited "ad-tech" vendor. It is operated and staffed by a very limited set of personnel and sells an ad transparency service that competes with DoubleVerify. In practice, Adalytics' main endeavors include periodically publishing articles on its website for marketing purposes. Adalytics presents these articles as "research" documents, but they are instead hit pieces full of inflammatory and baseless allegations against companies like DoubleVerify. Adalytics undertakes "research" for its blog posts and articles by cherry-picking an exceedingly small number of impressions from data it scrapes from a small sample of bot logs. This technique is prone to error, bias, and data manipulation. Adalytics spins its "analysis" of an anecdotal number of impressions into a narrative targeting advertising industry participants and uses its blog posts and articles to promote its own platform to advertisers, including customers and prospective customers of DoubleVerify. This malicious playbook, which Adalytics has now replicated on numerous occasions, is aimed at generating shock-based publicity for its own "platform" through defamation of ad industry participants.[1]

---

[1] As Adalytics recognized on its own website as recently as February 19, 2025, its "research" articles are generated to advertise its own services. "Like many other companies, we release thought leadership on systemic issues affecting brands and their media investments . . . to . . . attract new clientele." *About Adalytics*, Adalytics (Archived version of page dated Feb. 19, 2025)

7.     Around December of 2024, Adalytics began implementing its playbook against DoubleVerify when it disseminated a draft of the Article—containing false, misleading, disparaging, and defamatory statements that specifically referred to DoubleVerify and were understood as referring to DoubleVerify—to industry analysts, commentators and media outlets. One of these media outlets communicated the substance of certain of Adalytics' statements to DoubleVerify on January 3, 2025. Upon learning of the substance of Adalytics' false allegations and Adalytics' plans to publish these misrepresentations, DoubleVerify promptly and preemptively issued its own public statement on January 10, 2025 to clarify how its solutions work. DoubleVerify conclusively rebutted the substance of Adalytics' false statements in that public statement.[2]

8.     Despite being on notice of their falsity, Adalytics subsequently published its erroneous and defamatory statements via the Article on its website on March 28, 2025.[3] Adalytics did so in an effort to instill doubt about DoubleVerify's business operations and to win new customers for its own purported ad transparency "platform."

9.     DoubleVerify promptly responded to the Article (and its subsequent coverage by media outlets) via three public statements on the same day.[4] DoubleVerify also issued a full

---

https://web.archive.org/web/20250219114502/https://adalytics.io/about. Adalytics has since scrubbed this statement from its website.

[2] *Setting the Record Straight: Addressing Adalytics' Continued Misleading Claims*, DoubleVerify (Jan. 10, 2025), https://doubleverify.com/setting-the-record-straight-addressing-adalytics-continued-misleading-claims/.

[3] *On pre-bid bot detection and filtration - Are ad tech vendors serving US Government and Fortune 500 brands' digital ads to bots?*, Adalytics (Mar. 28, 2025), https://adalytics.io/blog/prebid-bot-filtration.

[4] *Statement on Adalytics' GIVT Report*, DoubleVerify (Mar. 28, 2025), https://doubleverify.com/statement-on-adalytics-givt-report/; *DoubleVerify's Response to The Wall Street Journal's Fact Check and Adalytics Report*, DoubleVerify (Mar. 28, 2025), https://doubleverify.com/doubleverifys-response-to-the-wall-street-journals-fact-check-and-adalytics-report/; *Understanding URLScan, Headless Browsers, and DV's Detection Methods*, DoubleVerify (Mar. 28, 2025), https://doubleverify.com/understanding-urlscan-headless-browsers-and-dvs-detection-methods/.

rebuttal of the contents of Adalytics' Article on April 7, 2025, including a point-by-point demonstration of the falsity of the statements contained in Adalytics' Article.[5]

10.    MRC subsequently issued a statement indicating that the Article contained "omissions related to and an incomplete understanding of MRC's IVT requirements as well as incomplete information related to audited vendor measurement and processes that may lead readers to incorrect conclusions."[6]  While MRC emphasized that it "does not frequently comment publicly on audit matters," it believed the Adalytics Article's "incomplete presentation of details related to these matters" required it to do so on this occasion:[7]

> "We don't do this lightly," MRC Executive Director and CEO George Ivie explained to MediaPost, noting: "Adalytics has issued many reports and we've never issued a statement.  We're issuing a statement here, because we think there are some implications that Adalytics has drawn that are incomplete or inaccurate and they cross with our standards and the application of our standards, so we felt like we needed to correct the record."  "Adalytics never showed us their blog post in advance.  They never spoke to us about that blog post and never even tried to correct or verify any facts that they were putting forward before they published their blog."[8]

11.    Despite DoubleVerify's response and MRC's public statement, Adalytics has, to date, neither corrected its false statements nor taken down its defamatory Article.

---

[5] *DoubleVerify's Response to Adalytics' March 28 GIVT Report*, DoubleVerify (Apr. 4, 2025), https://doubleverify.com/doubleverifys-response-to-adalytics-march-28-givt-report/.

[6] *MRC Statement on Pre-Bid IVT Requirements and Processes,* Media Rating Council (Apr. 1, 2025), https://mediaratingcouncil.org/sites/default/files/News/MRC%20Statement%20on%20pre%20bid%20IVT%20requirements%20and%20processes.pdf.  In October 2015, MRC issued the Invalid Traffic Detection and Filtration Guidelines, which it updated in June 2020 with the Invalid Traffic (IVT 2.0) Detection and Filtration Standards Addendum.  *See* https://www.mediaratingcouncil.org/sites/default/files/Standards/IVT%20Addendum%20Update%20062520.pdf (the "**MRC Guidelines**").

[7] *Id.*

[8] Joe Mandese, *MRC Rebuts Sensational 'Fraud' Report, Says It Failed To Grasp How Brands Filter Ads Served To Bots*, MediaPost, (Apr. 11, 2025), https://www.mediapost.com/publications/article/404993/mrc-rebuts-sensational-fraud-report-says-it-fai.html.

12.     Adalytics also coordinated with journalists from the Wall Street Journal ("**WSJ**") and other media outlets, as well as members of the Check My Ads Institute—a purported not-for-profit organization—ahead of the publication of its Article, in an attempt to achieve amplification of its false statements.  The same day that Adalytics published its Article, both the WSJ and AdExchanger (a news outlet focused on digital advertising content), as well as the Check My Ads Institute, published articles repeating the substance of Adalytics' false statements.

13.     Adalytics knew that its publication of false and misleading statements concerning DoubleVerify, and its attempts to amplify the reach of its defamatory statements, would have a broad detrimental impact on DoubleVerify's reputation and goodwill and among its customers. Statements asserting or implying that DoubleVerify does not effectively identify IVT and that the failure of the solution resulted in advertisers being charged for impressions served to bots and other non-genuine consumers are very likely to influence customers' decisions as to whether to purchase or continue purchasing advertisement verification services from DoubleVerify.

14.     Through this legal action, DoubleVerify seeks compensation for the substantial damage Adalytics inflicted on DoubleVerify's reputation, brand, goodwill, and business relationships.

**PARTIES**

15.     Plaintiff DoubleVerify Holdings Inc. is incorporated under Delaware law with its principal place of business in New York, New York.  DoubleVerify Holdings Inc. is a publicly traded company listed on the New York Stock Exchange.

16.     Plaintiff DoubleVerify Inc. is incorporated under Delaware law with its principal place of business in New York, New York.  DoubleVerify Inc. is a wholly-owned subsidiary of DoubleVerify Holdings Inc.

17.     Defendant Adalytics is a limited liability company formed under the laws of Maryland and does business in Gaithersburg, Maryland.  Adalytics' sole member is Krzysztof Franaszek, an individual who resides in Gaithersburg, Maryland and is a citizen of Maryland.

JURISDICTION AND VENUE

18.     This is a civil action for false advertising under federal law and for defamation, injurious falsehood, tortious interference with business relations, and unfair competition under Maryland law.

19.     This Court has original subject-matter jurisdiction over this action under 15 U.S.C. § 1121 and 28 U.S.C. §§ 1331, 1338.  This Court has supplemental jurisdiction over DoubleVerify's Maryland law claims under 28 U.S.C. § 1367(a) because they are so related to the claims in this action over which this Court has original jurisdiction that they form part of the same case or controversy.

20.     This Court also has diversity jurisdiction over this lawsuit under 28 U.S.C. § 1332 because the amount in controversy exceeds $75,000, exclusive of costs and interest, and is between citizens of different states, as set forth in paragraphs 15-17.  As set forth below, Adalytics' false, misleading, defamatory, and disparaging statements have caused DoubleVerify significant financial harm, in excess of $75,000.

21.     This Court has personal jurisdiction over Adalytics because it is a limited liability company formed under Maryland law, whose only member is a citizen and resident of Maryland, and which maintains its principal place of business in Maryland.

22.     Venue is proper in this judicial district under 28 U.S.C. § 1391(b)(1) because Adalytics resides in this district.  Venue is also proper in this judicial district under 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claims asserted in this Complaint occurred in this judicial district.  Venue is proper in the Southern Division

because Adalytics resides in Gaithersburg, Maryland and the claims asserted in this Complaint arose from acts in Gaithersburg (Montgomery County).

**FACTUAL BACKGROUND**

A.    **DOUBLEVERIFY AND ITS BUSINESS**

23.    DoubleVerify has nearly two decades of experience in helping brands, agencies, and publishers verify that their digital advertising investments are delivered as intended. DoubleVerify operates across a variety of channels to offer its customers greater control and confidence in their advertising strategies.

24.    DoubleVerify provides two primary solutions to advertisers.  *First*, DoubleVerify protects its customers' reputations by ensuring that their online advertisements are displayed on websites with content that aligns with their brand values.  *Second*, DoubleVerify protects its customers from online advertising-related fraud, including by protecting them from sophisticated schemes perpetrated by criminal organizations and from being billed for advertising impressions served to visitors that are not genuine human users (*e.g.* those arising from IVT).  This lawsuit concerns DoubleVerify's fraud-protection service.[9]

25.    IVT falls into two categories: GIVT and SIVT.

26.    GIVT includes traffic generated from automated sources, such as from search engine crawlers or auditing bots, that can be filtered or identified using routine methods and typically lacks malicious intent.  GIVT can serve legitimate purposes, such as to index websites for searching or to test internet performance.  However, if not appropriately filtered out, advertising

---

[9] Advertising-related fraud is not intended to represent a legal determination of fraud, but instead refers to compliance (or lack thereof) with advertising measurement objectives in accordance with industry standards and the MRC Guidelines.

impressions arising from GIVT can inflate an advertiser's charges and distort metrics like audience engagement.

27.     On the other hand, SIVT purveyors actively attempt to emulate a human user to avoid detection, making SIVT more difficult to identify than GIVT.

28.     To protect its customers from charges for GIVT impressions, DoubleVerify customers can elect to implement "pre-bid" (upstream) and/or "post-serve" (downstream) solutions—also referred to as "post-bid" solutions.  These terms refer to solutions deployed either before completion of the advertisement impression "bidding" process, which is further described below, or after the advertisement is served to the website visitor.

29.     The placement of "programmatic" advertisements on websites generally functions through a high-speed and highly automated auction-type process.  When a user visits a webpage, the website's publisher sends out a request for bids to various Demand-Side Platforms ("**DSPs**").  DSPs allow advertisers to make and manage bids for impressions, in coherence with their overall advertising campaign objectives and certain other parameters.  Each request for bids includes certain information about the webpage and, in some circumstances, information about the visitor.

30.     Advertisers analyze this information in view of their own advertisement targeting criteria and campaign goals, and they place bids for the impression through the DSPs.  The right to display an advertisement is generally awarded to the highest bidder in this process, which is typically completed by automated means within fractions of a second.

31.     When "pre-bid" protection is enabled, DoubleVerify assists its customers at the "auction" or "pre-bid" stage by analyzing data included with requests for bids and blocking customers from bidding on impressions that arise from IVT.  This upstream filtering process

prevents companies from bidding on, or being charged for, most IVT, including 99% of unwanted GIVT impressions.

32.    Not all IVT impressions are able to be detected or avoided in the pre-bid stage, however.  Some SIVT impressions, for instance, may not be caught at the pre-bid stage because they are often deliberately masked to avoid detection.  However, they are then identified and managed "downstream."

33.    DoubleVerify provides advertisers both pre-bid and post-serve IVT solutions, which advertisers may use to supplement each other or as standalone solutions.  Critical to the false and misleading nature of its statements is Adalytics' assertion that the presence of DoubleVerify code on pages from which advertisements were allegedly served to bots is an indication that DoubleVerify's pre-bid solution did not work.  In making this assertion, Adalytics' "research" intentionally ignores that the presence of any DoubleVerify code on these pages could be for a number of reasons, and that DoubleVerify customers may enable only *post-serve* solutions (as a standalone service to detect and report IVT impressions).  Adalytics has the motive to disparage the efficacy of DoubleVerify's pre-bid solutions because DoubleVerify is a leader in the space, while Adalytics does not offer pre-bid services.  Adalytics' defamatory statements are an attempt to make its own offering appear more attractive by comparison, because Adalytics focuses on the post-serve stage only.

34.    Regardless of whether DoubleVerify's post-serve solution is used alone or in tandem with its pre-bid protection, customers are effectively protected from charges for IVT impressions.  Consistent with industry standards, DoubleVerify removes GIVT impressions from billable reporting and, with respect to SIVT, those impressions are identified to the advertiser to seek compensation from the seller of the ad placement.

35.     Depending on an advertiser's specific objectives, DoubleVerify's customers can use DoubleVerify's pre-bid (avoidance) and its post-serve (detection and deduction) systems separately or integrate them into a suite of services. Its technology leverages hundreds of signals and proprietary analysis techniques to accurately identify IVT and to either avoid or detect and deduct IVT impressions. This dual-pronged approach assists customers in maintaining the integrity of their advertisement campaign and investments—minimizing wasted ad spend on IVT.

36.     DoubleVerify's IVT solutions are fully compliant with MRC's Guidelines, which mandate only post-serve (*i.e.*, post-bid) filtration of impressions and removal of GIVT from monetized impression counts. DoubleVerify's IVT solutions are accredited by MRC through annual audits by independent third-parties. The auditing process includes review and inspection of source code, tests of controls, data analytics and designed activity testing. DoubleVerify's IVT solutions are also certified by TAG.

37.     DoubleVerify's pre-bid avoidance solution goes further than the MRC Guidelines, blocking an even higher percentage of IVT. In fact, when pre-bid avoidance is enabled, IVT impressions from known (self-declared) bots make up, on average, less than 0.03% of the programmatic advertising impressions served to DoubleVerify customers. Virtually all of the remaining IVT impressions are then effectively detected by DoubleVerify at the post-serve stage through either removal from the customer's billable counts (for GIVT) or flagging for subsequent reimbursement (for SIVT). In short, DoubleVerify's "pre-bid" and "post-serve" solutions offer its customers the best tools available in the industry to ensure minimal charges for IVT impressions. DoubleVerify makes IVT campaign data available to its customers via periodic disclosure reports and DoubleVerify's user interface.

B.    <u>DoubleVerify's Efforts to Combat Ad Fraud</u>

38.    Fraud in the online advertisement industry takes on various forms, but a frequent scheme involves a deliberate attempt to deceive or manipulate an advertising system to unjustly generate revenue for a publisher or media seller.  For example, one technique known as "ad stacking" involves placing multiple ads, stacked on top of each other, on the same webpage.  Left unchecked, "ad stacking" can result in an advertiser being fraudulently charged for impressions of all the advertisements (even though only the top ad is visible to the website visitor).

39.    While IVT from many bots is not inherently malicious and is effectively filtered out by industry participants, other malicious bots can participate in ad fraud.  Malicious bots can do so by mimicking the behavior of genuine human website visitors.  In the absence of effective fraud-fighting solutions like those provided by DoubleVerify, advertisers may be billed for impressions arising from the traffic of these malicious bots.

40.    DoubleVerify has an established track record of discovering and disclosing to the public the most sophisticated ad fraud schemes in the industry and has established a multi-disciplinary Fraud Lab composed of data scientists, analysts, cybersecurity researchers and developers.  The Fraud Lab analyzes billions of impressions each day to identify SIVT—including from hijacked devices, "bot fraud" and "injected ads."  DoubleVerify also employs artificial intelligence-backed methodologies to improve accuracy, coverage scope, and protection of its customers.  DoubleVerify's work has saved its customers (as well as other industry participants) billions of dollars in advertising investments that may otherwise have been lost to these fraudulent schemes.  For example, DoubleVerify uncovered a massive ad fraud scheme which had been targeting millions of connected televisions every day:

> The ad verification company DoubleVerify has uncovered a complex ad fraud scheme involving more than 2 million devices a day and costing advertisers more than $5 million a month. The scheme, revealed today, has already been used on

well-known devices including Roku, Amazon Fire and Apple TV, according to DoubleVerify.[10]

41.    Finally, DoubleVerify has earned the TAG "Certified Against Fraud" seal every year since the program's inception in 2016.  TAG is the first and only Information Sharing and Analysis Organization for the digital advertising industry, which is a designation made by the U.S. Department of Homeland Security.  To earn the seal, companies must demonstrate to TAG that they meet an extensive set of guidelines and that they are committed to reducing IVT waste in the digital advertising supply chain (including through IVT impression detection and deduction). DoubleVerify's consistent certification and overall track record on reducing IVT is proof that DoubleVerify sets the standard for trust and transparency in combatting IVT waste in the online advertising industry.

## C.    ADALYTICS' PLAYBOOK OF PUBLISHING FALSE, MISLEADING, DEFAMATORY, AND DISPARAGING STATEMENTS

42.    Adalytics is a for-profit company, owned and operated by its only member, Krzysztof Franaszek.  Adalytics has a single full-time employee (also Franaszek) and "zero investors."[11]  Adalytics purports to conduct advertising analytics and to serve brands and ad buyers by providing "a next generation ad quality and transparency platform" that "help[s] brands secure control over their media investments."

---

[10] Marty Swant, *DoubleVerify Detects New Ad Fraud Scheme On Connected TV Devices That's Costing Advertisers Millions*, Forbes (Mar. 4, 2021) https://www.forbes.com/sites/martyswant/2021/03/04/doubleverify-detects-new-ad-fraud-scheme-on-connected-tv-devices-thats-costing-advertisers-millions/. *See also, e.g.*, Duncan Riley, *White-noise Apps Exploited in Major Audio Ad Fraud Schemes, Report Finds*, SiliconANGLE (Nov. 4, 2024) https://siliconangle.com/2024/11/04/white-noise-apps-exploited-major-audio-ad-fraud-schemes-report-finds/ (reporting on DoubleVerify's discovery that white-noise apps were being exploited to commit audio stream ad fraud—*i.e.* selling audio impressions where ads were never actually played).

[11] James Hercher, *Meet Adalytics, An Asteroid Headed For Ad Tech*, AdExchanger (Feb. 12, 2024), https://www.adexchanger.com/online-advertising/meet-adalytics-an-asteroid-headed-for-ad-tech/.

43.    Adalytics has repeatedly used the same malicious playbook complained of in this lawsuit to attack and smear the reputation of other companies in the online advertising ecosystem—all in an attempt to grow its own business.

44.    For example, Adalytics previously published a blog post suggesting that Colossus SSP ("**Colossus**"), a so-called "sell-side platform," was altering data concerning website visitors at the pre-bid stage to make the impressions "higher value" and to allegedly generate more revenue. Adalytics' blog post targeting Colossus has been described as "a hit-piece masked as a research report,"[12] and is the subject of pending litigation by Colossus in this District.[13]

45.    Google has also been on the receiving end of misguided Adalytics blog posts.  As stated by Google's representative in the aftermath of the publication of that blog post: "Adalytics is operating with an agenda."  Its "business interest lies in creating distrust and gaining attention with reports, even flawed or inaccurate ones."[14]   In the words of another industry observer, Adalytics' malicious playbook and repeat strategy is "the digital equivalent of tar and feathering someone in the town square."[15]

---

[12] Shailin Dhar, *Eating in the Dark — #1 — Adtech & Adfraud Research*, Medium (June 19, 2024), https://medium.com/@shailin_futureproof/eating-in-the-dark-1-adtech-adfraud-research-9727f99c0527.

[13] *Colossus Media LLC v. Adalytics Research LLC,* (D. Md. 2025).  In that action, Colossus sued Adalytics for (1) false advertising and unfair competition under 15 U.S.C. § 1125 (the "**Lanham Act**"), (2) defamation under Maryland law and (3) injurious falsehood under Maryland law.  On March 5, 2025, the Court denied Adalytics' motion to dismiss these counts.

[14] James Hercher, *Meet Adalytics, An Asteroid Headed For Ad Tech*, AdExchanger (Feb. 12, 2024), https://www.adexchanger.com/online-advertising/meet-adalytics-an-asteroid-headed-for-ad-tech/.

[15] Trey Titone, *Adalytics Explained: Imperfectly Improving an Imperfect Ecosystem*, Ad Tech Explained (Feb. 20, 2025), https://www.adtechexplained.com/p/adalytics-explained.

D.    **ADALYTICS' FALSE, MISLEADING, DEFAMATORY AND DISPARAGING STATEMENTS CONCERNING DOUBLEVERIFY**

46.     Around December 2024, Adalytics began disseminating a draft article to media outlets that included false, misleading, disparaging, and defamatory statements that specifically referred to DoubleVerify and were understood as referring to DoubleVerify.

47.     DoubleVerify learned of this draft article's existence on January 3, 2025 from a media outlet, which also conveyed the substance of certain statements in the draft to DoubleVerify.

48.     DoubleVerify understood that Adalytics was preparing to publish this draft as an article on its publicly-available website—consistent with Adalytics' malicious playbook, which involves defaming, disparaging and spreading falsehoods and misrepresentations about online advertising industry participants via purported "research" articles and coordinating with media outlets to achieve immediate amplification of the false statements contained therein.

49.     On January 10, 2025, DoubleVerify preemptively published an article on its own website, responding to the substance of the points that it understood would be included in Adalytics' then-forthcoming Article.  DoubleVerify outlined detailed responses to each of these points to rebut the inaccurate claims about DoubleVerify and misrepresentations about IVT and industry standards.[16]  Adalytics was therefore on notice, at latest on January 10, 2025, of the falsity of its planned public statements.

50.     Nevertheless, on March 28, 2025, Adalytics published its erroneous and defamatory statements via its publicly available website under the highly misleading heading: "On pre-bid bot detection and filtration- Are ad tech vendors serving US Government and Fortune 500

---

[16] *Setting the Record Straight: Addressing Adalytics' Continued Misleading Claims*, DoubleVerify (Jan. 10, 2025),    https://doubleverify.com/setting-the-record-straight-addressing-adalytics-continued-misleading-claims/.

brands' digital ads to bots?"   Adalytics' Article contained the same false statements that DoubleVerify had publicly debunked more than two months earlier.[17]

51.   Adalytics' Article falsely and misleadingly portrays DoubleVerify's web advertisement verification and fraud protection services as ineffective, including by stating or clearly implying that DoubleVerify's customers are regularly billed for GIVT impressions. Adalytics' Article alleges that a list of 49 publishers ("and many others") utilizing DoubleVerify's publisher optimization tools "have been serving ads on behalf of Fortune 500, United States Government, or other advertisers to bots."   The Article further expressly states that "advertisers were billed by ad tech vendors for ad impressions served to declared bots operating out of known data center server farms," which refers to ad impressions being served to and billed for GIVT.[18]

52.   As to DoubleVerify, that statement is false, not supported by the facts, and appears to be based on Adalytics' willful blindness to post-serve detection and filtration.   Adalytics calls into question DoubleVerify's pre-bid solution by suggesting that the presence of DoubleVerify code on a page from which an impression was allegedly served to a bot indicates that DoubleVerify's pre-bid solutions did not work.   In doing so, Adalytics willfully ignores that these impressions could have been served by DoubleVerify customers that do not even have its pre-bid solutions enabled.

---

[17] *On Pre-Bid Bot Detection and Filtration—Are Ad Tech Vendors Serving US Government and Fortune 500 Brands' Digital Ads to Bots?*, Adalytics (Mar. 28, 2025), https://adalytics.io/blog/prebid-bot-filtration.

[18] The Article doubles down on the false inference that advertisers are charged for impressions served to self-declared bots and other known GIVT, which Adalytics knows is not true.  *See, e.g.*, statement of Krzysztof Franaszek (Adalytics' sole member), X (formerly Twitter) (Mar. 9, 2022), https://x.com/kfranasz/status/1501641146321276936 ("We observed instances where WSJ's own subscription ad campaigns were served on misreported inventory, nom-ads.txt compliant inventory, or even to self-declared crawlers or bots.").

53.     Since the publication of Adalytics' Article, DoubleVerify has conducted extensive testing on the list of impressions that Adalytics represented as served by DoubleVerify customers. For **all** of the impressions cited in the Article that DoubleVerify was able to identify from its records, DoubleVerify has confirmed that it effectively detected the IVT impressions at the post-serve stage. In all such cases, the impressions were either removed from the relevant customers' billable counts (for GIVT impressions) or flagged for reimbursement (for SIVT impressions). In accordance with industry standards (including MRC Guidelines), customers should not be charged by the DSP for any GIVT impressions that are removed from billable counts and can seek reimbursement for SIVT impressions that are flagged.[19]

54.     Beyond its core false assertion that DoubleVerify's customers are being charged for known IVT impressions due to DoubleVerify's failure to properly identify IVT, Adalytics' Article is riddled with other demonstrably false and intentionally misleading statements—including, but not limited to, the following:

55.     *First*, Adalytics dramatically exaggerates the amount of "waste" arising from IVT (*i.e.*, the amount that advertisers pay for impressions attributable to IVT), by misleadingly presenting data concerning SIVT and GIVT together. GIVT generally includes traffic from non-malicious or easily identifiable sources—such as from known data centers or web crawlers—and is overwhelmingly filtered out at the pre-bid stage using rule-based methods and "blacklists." SIVT, in contrast, encompasses traffic from more deceptive and complex sources, including fraudulent activity such as from malicious bots mimicking human behavior, hidden ads, and

---

[19] DoubleVerify was able to identify 43 of the impressions from its records. For all these impressions, DoubleVerify accurately identified and deducted the impression from its customer's billable count at the post-serve stage. Records for certain of the other impressions were not found due to the age of those impressions and DoubleVerify's data retention policies, which do not call for retention of detailed, impression-by-impression information from that long ago.

malware-generated traffic.  Effective detection and filtration of SIVT requires more advanced techniques—such as behavioral analysis and machine learning.  Detection of certain IVT is typically possible only at the post-serve stage due to the sophistication of the traffic and signals available to verification providers pre-bid.

56.    Accordingly, the ad industry, in alignment with industry self-regulatory bodies such as MRC, IAB, and TAG, differentiates impressions attributable to GIVT from impressions attributable to SIVT.  Adalytics nevertheless intentionally conflates these two sources to support its narrative of rampant GIVT-based "waste" and to create the false impression that DoubleVerify's customers are routinely charged for known GIVT impressions.  These customers, however, are not charged.  In reality, only a very small proportion of GIVT traffic is not able to be captured by DoubleVerify's pre-bid filtration.  The remaining IVT impressions (from both that small portion of GIVT, as well as from SIVT) are effectively identified and filtered at the post-serve stage.  Accordingly, DoubleVerify's service is, in fact, extremely effective at protecting customers from potential IVT "waste"—saving them millions of dollars annually.

57.    *Second*, Adalytics erroneously (and intentionally) implies that the URLScan bot, the bot frequently referenced in its Article, is a "declared" bot (*i.e.* a bot that announces itself as such when visiting a webpage) and implies that DoubleVerify customers are nevertheless regularly charged for impressions known to be served to the URLScan bot.  Both these statements are demonstrably false.  The URLScan bot does ***not*** typically "declare" itself as a bot when visiting webpages.[20]  In fact, the URLScan bot often triggers scripts that reproduce activity similar to that

---

[20] URLScan's Chief Executive Officer stated that the bot "does not announce itself, that would defeat the purpose of the tool.  Instead, it will look like a regular web-browser."  *DoubleVerify's Response to The Wall Street Journal's Fact Check and Adalytics Report*, DoubleVerify (Mar. 28, 2025), https://doubleverify.com/doubleverifys-response-to-the-wall-street-journals-fact-check-and-adalytics-report.

of a legitimate user (such as scrolling interaction), the purpose of which is to escape bot detection filters. Adalytics' presentation of impressions served to the URLScan bot by DoubleVerify customers as examples where ads were served "to declared bots in data centers" is therefore false and misleading. Moreover, as with other impressions attributed to its customers in the Article, DoubleVerify has confirmed that, for all impressions referenced in the Article as served to the URLScan bot, that it was able to identify from its records, the impressions were effectively filtered out from DoubleVerify's customers' billable counts at the post-serve stage.

58.    *Third*, there is no apparent connection between DoubleVerify and over half of the impressions cited in the Article as the basis for the allegations against DoubleVerify. The Article references 115 screenshots of impressions that it implies were served by DoubleVerify customers. However, records for the underlying impressions of ***at least 62*** of the screenshots lack any discernible DoubleVerify tag, signal, or any other apparent connection to DoubleVerify. There is, in fact, no evidence (in the Article or otherwise) that DoubleVerify had anything to do with the impressions shown in those screenshots or that the advertiser at issue was using a DoubleVerify solution, despite Adalytics' plain statements to the contrary. Adalytics misleadingly presents many of the remaining 53 screenshots as showing impressions served by DoubleVerify customers, based on the presence of certain DoubleVerify code on those webpages. However, DoubleVerify code (or a tag) is placed on webpages for a host of different reasons—meaning that many of the impressions shown in these 53 screenshots were ***also*** likely served by advertisers that were not using DoubleVerify's pre-bid IVT solution (and/or by advertisers that were not using any DoubleVerify advertisement verification solution at all).[21]

---

[21] Code on a page referencing DoubleVerify can be present (a) for advertisers using only a post-serve solution standalone, (b) for advertisers that used a pre-bid solution other than IVT (*e.g.* viewability only), (c) for DoubleVerify's solutions provided to publisher clients for reporting purposes, or (d) as code from a

59.    *Fourth*, in at least **75** different instances throughout the Article, Adalytics erroneously attributes source code authored by DSPs to DoubleVerify, to suggest that DoubleVerify "had [brands'] ads served to bots in data centers."  Adalytics purports to draw this conclusion based on the inclusion of the term "DoubleVerify" in a single line of that source code ("charge-allDoubleVerifyBotAvoidance").  However, as Adalytics knows (or should know), that is **not** DoubleVerify source code.  Rather, it is source code generated by **the particular DSP** that served the ad.  This is a recurring false attribution across several of Adalytics' prior publications that, much like other misstatements in its Article, Adalytics did not even attempt to confirm with DoubleVerify before publication.  Moreover, for at least one impression that Adalytics alleges was served to a bot operating out of a known data center, DoubleVerify was able to identify the IP address of the device to which that impression was served (despite Adalytics' own failure to include IP addresses in its Article—likely in an attempt to prevent scrutiny of its claims).  As Adalytics would be able to easily confirm, that IP address is **not** in TAG's list of known data centers, and traffic from that IP address is **not** considered GIVT under industry standards.

60.    *Fifth*, Adalytics focuses on pre-bid filtration and feigns ignorance of the effectiveness of post-serve solutions to claim and imply that DoubleVerify customers are affected by rampant ad fraud.  That is false.  For example, **only** post-serve filtration is mandated by MRC,[22] and post-serve filtration is deemed equally acceptable to pre-bid filtration by other industry

---

third-party DSP that references DoubleVerify but is completely unrelated to a DoubleVerify advertiser IVT solution.

[22] According to MRC's Guidelines, post-serve "detection and filtration techniques are required for compliance." *Invalid Traffic Detection and Filtration Standards Addendum Update,* Media Rating Council (June 2020), https://mediaratingcouncil.org/sites/default/files/Standards/IVT%20Addendum%20Update%2006252020.pdf.  In fact, MRC's Guidelines provide that "organizations employing [pre-bid] IVT filtration techniques **must** do so **in combination with** required [**post-serve**] detection and filtration techniques." *Id.* (emphasis added).

standards—including, for example, TAG's Guidelines.[23]   In any event, DoubleVerify is accredited by the MRC for post-serve detection and filtration of GIVT and SIVT and is also accredited for pre-bid IVT filtration.   The accreditation process requires annual audits and includes review and inspection of proprietary source code, control tests and data analytics.

61.   *Sixth*, Adalytics falsely labels various practices as "fraud" (it uses that word over 120 times in its Article).   This is grossly misleading given that Adalytics itself concedes that none of the impression records it reviewed showed any impressions related to bots "seeking to commit ad fraud."   As a result of its intentionally false and deliberately misleading use of the term "fraud," at least one media outlet reported that Adalytics' Article was a report on "ad fraud."[24]

62.   *Seventh*, Adalytics states and clearly implies that DoubleVerify is providing ineffective services to specific customers (which the Article references by name).   This is a false, inflammatory, and malicious statement.   Moreover, Adalytics' baseless suggestion that these customers should "undertak[e] a closer review of their digital advertising" is defamatory and prejudicial to DoubleVerify's business relations.

63.   Adalytics' statements and their clear implications can reasonably be interpreted to declare or imply to members of the public untrue facts about the efficacy of DoubleVerify's services.

---

[23] TAG's Guidelines provide that companies can filter monetizable transactions (including impressions, clicks, and conversions) arising from IVT "either pre-bid or post-serve, so long as monetizable impressions are filtered to remove bot impressions." *TAG Certified Against Fraud Guidelines*, Version 10, Trustworthy Accountability Group, (July 2024), https://2848641.fs1.hubspotusercontent-na1.net/hubfs/2848641/CAF/TAG%20CAF%20Guidelines%20Final.pdf.

[24] Wendy Davis, *Lawmaker Seeks Probe of Ad-Fraud Verification Firms*, MediaPost (Mar. 28, 2025), https://www.mediapost.com/publications/article/404630/lawmaker-seeks-probe-of-ad-fraud-verification-firm.html.

E.    **ADALYTICS CONTINUES TO PUBLISH FALSE AND MISLEADING STATEMENTS REGARDING DOUBLEVERIFY**

64.    Notwithstanding DoubleVerify's response to the Article—which included detailed explanations of the falsity of all the points above as well as supporting evidence—Adalytics has failed, to date, to correct or take down its defamatory Article.

65.    Adalytics also actively worked to amplify its false and misleading statements in the marketplace, in an attempt to harm DoubleVerify's business and reputation.  Enabled by Adalytics' strategy of previewing its draft articles, various media outlets and the Check My Ads Institute published their own pieces repeating false claims in Adalytics' Article.  Those pieces further amplified Adalytics' defamation of DoubleVerify.

66.    For example, on March 28, 2025, the WSJ published an article entitled "Efforts to Weed Out Fake Users for Online Advertisers Fall Short," which repeated Adalytics' false claim that DoubleVerify "regularly miss[es] nonhuman traffic."  The WSJ article claims that Adalytics' Article focuses on "cases when bots identified themselves as such, because they were used for benign purposes like archiving websites and detecting security threats."

67.    Other media outlets have published similar articles, echoing and further dispersing Adalytics' defamatory Article.  For example, AdExchanger (to which Adalytics sent a pre-publication draft) published three articles (and a podcast) with highly misleading headlines, repeating Adalytics' false statements: "Adalytics: The Ad Industry's Bot Problem Is Worse Than We Thought," "Verification Providers Missed Easy-To-Spot Bots, Says Adalytics.  What Went Wrong?, and "Bots And Games Are Back (For Ad Tech)."[25]

---

[25] Anthony Vargas, *Adalytics: The Ad Industry's Bot Problem Is Worse Than We Thought*, AdExchanger (Mar. 28, 2025), https://www.adexchanger.com/platforms/adalytics-the-ad-industrys-bot-problem-is-worse-than-we-thought/; Anthony Vargas, *Verification Providers Missed Easy-to-Spot Bots, Says Adalytics: What Went Wrong*, AdExchanger (Mar. 31, 2025), https://www.adexchanger.com/platforms/verification-providers-missed-easy-to-spot-bots-says-adalytics-what-went-wrong/; James Hercher, *Bots*

\*       \*       \*

68.    Adalytics' unlawful efforts were designed to harm DoubleVerify's standing in the marketplace, to Adalytics' financial benefit.  Adalytics made its false statements in furtherance of this financially motivated scheme.  Despite the profit motive of the Article, Adalytics coordinated with the Check My Ads Institute, an entity that purports to be a nonprofit organization,[26] to amplify and disseminate its false statements.

69.    As a direct result of Adalytics' false and defamatory statements, DoubleVerify has incurred significant reputational harm—which DoubleVerify is effectively mitigating, but which nevertheless has also caused and continues to cause it financial harm.  To mitigate this harm, DoubleVerify was forced to divert substantial resources toward countering Adalytics' misinformation, including (a) the development of multiple comprehensive, public responses to Adalytics' false statements; (b) efforts to engage with media outlets to correct the public record; and (c) expenditure of significant employee time and resources to respond to inquiries from existing and potential customers and stockholders regarding Adalytics' false statements.  DoubleVerify would not have incurred these expenses but for Adalytics' publication of its false and misleading statements.  DoubleVerify Holdings Inc. has also suffered financial harm through negative impact to its stock price.

70.    Beyond the direct financial harm sustained by DoubleVerify as a result of Adalytics' false statements, the Article has caused damage to DoubleVerify's reputation and goodwill by clearly implying that DoubleVerify is engaged in fraudulent activity, and impeaching DoubleVerify's honesty, integrity, and core business principles.

---

*And Games Are Back (For Ad Tech)*, AdExchanger (Apr. 4, 2025), https://www.adexchanger.com/the-big-story/bots-and-games-are-back-for-ad-tech/ (including an embedded podcast with the same title).

[26] *About Us*, Check My Ads Institute, https://checkmyads.org/about/.

## CAUSES OF ACTION

### COUNT 1: FEDERAL FALSE ADVERTISING AND UNFAIR COMPETITION
### (15 U.S.C. § 1125(A) – THE LANHAM ACT)

71.     DoubleVerify incorporates the preceding paragraphs by reference as if fully set forth herein.

72.     Adalytics is engaged in commerce and purports to compete with DoubleVerify.  Adalytics' website (where the Article was published) is a commercial website— and the homepage of that site advertises Adalytics' services and invites users to provide contact information to learn more about those services. Adalytics' statements in the Article thus constitute actionable commercial speech.

73.     As described above, Adalytics published false and misleading statements in commercial advertising and promotion in violation of 15 U.S.C. § 1125 (the Lanham Act).

74.     Adalytics placed these false and misleading statements into interstate commerce by publishing them on Adalytics' publicly accessible website, http://adalytics.io/blog.

75.     Adalytics' false and misleading statements were intended to damage DoubleVerify's business and reputation for the purpose of gaining a competitive advantage— including efforts to sell Adalytics' services and win new business from customers of DoubleVerify.

76.     Adalytics' statements are false and misleading descriptions of fact that have or are likely to cause confusion, mistake, or deception, and misrepresent the nature, characteristics, and qualities of DoubleVerify's business and the services that it offers.

77.     Adalytics' statements have materially influenced, and are likely to materially influence, purchasing decisions because advertisers, publishers, advertising agencies, ad buyers,

or ad technology vendors are misled to incorrectly believe that DoubleVerify is disreputable, is untrustworthy, and employs fraudulent business practices, when it does not.

78.    Adalytics knew that its statements were false and/or misleading based on its expertise in the online advertising market and because accurate, responsive information was publicly posted on DoubleVerify's website more than two months prior to Adalytics' publication of its Article.

79.    Adalytics' false and misleading statements are likely to confuse (and have confused) consumers.  For example, following publication of the Article, DoubleVerify fielded inbound calls from its customers regarding the effectiveness of DoubleVerify's services based on claims made in the Article.  DoubleVerify has expended (and continues to expend) significant resources to address the confusion created by Adalytics' false and misleading statements.

80.    Adalytics' false and misleading descriptions of fact have directly caused and will continue to cause the loss of goodwill and the loss of business and prospective customers and industry partners who, but for Adalytics' actions, would continue or begin to do business or otherwise associate with DoubleVerify.

81.    By reason of the foregoing, Adalytics is liable in an amount to be determined at trial, plus interest.

### COUNT 2: DEFAMATION
### (MARYLAND COMMON LAW)

82.    DoubleVerify incorporates paragraphs 1 to 70 by reference as if fully set forth herein.

83.    Adalytics published false and misleading statements to the public, actual and prospective customers of DoubleVerify, and members of the industry.

84.    Adalytics' false and misleading statements specifically refer to DoubleVerify and are understood as referring to DoubleVerify.

85.    Adalytics knew (or should have known) that its statements were false and misleading based on its claimed expertise in advertising technology, as well as DoubleVerify's publication of a pre-emptive article, available for more than two months prior to Adalytics' publication of its Article, providing notice that the statements were false and that DoubleVerify could demonstrate that falsity.  Therefore, Adalytics published its statements with actual malice. As further demonstration that Adalytics acted with malice, Adalytics disseminated a draft version of its Article to media outlets before it was published, without ever asking DoubleVerify for comment or explanation, underscoring that Adalytics' only goal was to spark demand for its ad transparency "platform" by generating negative media coverage about DoubleVerify.

86.    As described in the preceding paragraphs, Adalytics' false and misleading statements (including those in the Article) are unambiguously defamatory, both on their face and by necessary implication.  Adalytics' false and misleading statements disparage the business reputation of DoubleVerify, including by falsely accusing it of failing to provide effective advertisement verification solutions to its consumers.  Therefore, Adalytics' statements constitute defamation *per se.*  In the alternative, Adalytics' false statements constitute defamation *per quod.*

87.    Adalytics' defamatory statements directly and proximately injured DoubleVerify, causing and resulting in damages, including by negatively impacting DoubleVerify Holdings Inc.'s stock price, as well as harm to DoubleVerify's relationships with advertisers and publishers, loss of goodwill, and reputational injury.

88.     Adalytics' defamatory statements expressly or impliedly assert facts that are objectively verifiable.  Adalytics intended its statements to be defamatory by implication or endorsed that inference.

89.     By reason of the foregoing, Adalytics is liable in an amount to be determined at trial, plus interest.

### COUNT 3: INJURIOUS FALSEHOOD
### (MARYLAND COMMON LAW)

90.     DoubleVerify incorporates paragraphs 1 to 70 by reference as if fully set forth herein.

91.     As described above, Adalytics published false, misleading, defamatory and disparaging statements to the public, actual and prospective customers of DoubleVerify, and members of the industry.

92.     These false, misleading, defamatory and disparaging statements were made in an effort to damage DoubleVerify's business and reputation for the purpose of selling Adalytics' services and winning new business.  Accordingly, Adalytics acted with actual malice in publishing the false, misleading, defamatory and disparaging statements.

93.     Adalytics knew, or should have known, that the statements were false and misleading based on its expertise in advertising technology and programmatic advertising, as well as through DoubleVerify's repeated prior public statements, prior to publication of its Article, providing notice that the statements are false and misleading, and that DoubleVerify could demonstrate that falsity.  Accordingly, Adalytics acted with actual malice in publishing the false and misleading statements.  As further demonstration that Adalytics acted with malice, Adalytics disseminated a draft version of its Article to media outlets before it was published, without ever asking DoubleVerify for comment or explanation, underscoring that Adalytics' only goal was to

spark demand for its ad transparency "platform" by generating negative media coverage about DoubleVerify.

94.    Adalytics published its false, misleading, defamatory and disparaging statements for the purpose of doing harm to the interests of DoubleVerify in a manner in which Adalytics was not privileged so to interfere by knowingly making false public statements to drive customers away from DoubleVerify.  Accordingly, Adalytics acted with actual malice in publishing the false and misleading statements.

95.    Adalytics' false statements directly and proximately caused DoubleVerify to suffer special damages, including pecuniary damages in the form of expenses incurred for DoubleVerify's measures reasonably necessary to counteract the Article's harm to DoubleVerify's business, including by negatively impacting DoubleVerify Holdings Inc.'s stock price and harming DoubleVerify's relationships with advertisers and publishers, as well as harm to its goodwill and reputation.

96.    Adalytics continues to directly and proximately cause special damages to accrue as DoubleVerify continues to incur expenses from the measures it continues to take that are reasonably necessary to counteract the publication's harm to DoubleVerify's business, goodwill, and reputation.

97.    Adalytics' false statements may cause DoubleVerify to lose current and prospective customers and industry partners who, but for Adalytics' actions, would continue or begin to do business or otherwise associate with DoubleVerify.

98.    Appropriate circumstances justify punitive damages against Adalytics because it committed its tortious acts with actual malice and caused special damages to DoubleVerify.

99.     By reason of the foregoing, Adalytics is liable in an amount to be determined at trial, plus interest.

### COUNT 4: TORTIOUS INTERFERENCE WITH BUSINESS RELATIONS
### (MARYLAND COMMON LAW)

100.    DoubleVerify incorporates paragraphs 1 to 70 by reference as if fully set forth herein.

101.    Adalytics is aware of DoubleVerify's prestige, accreditation and certifications in the advertising industry.

102.    Adalytics is aware of the services provided by DoubleVerify, including that DoubleVerify provides ad verification solutions to both advertisers and to publishers.

103.    Adalytics is aware of existing business relations between DoubleVerify and its customers, including those publishers and advertisers named by Adalytics in its Article.

104.    Adalytics regularly markets its services to and solicits DoubleVerify's customers using its "research" publications (including its Article).

105.    Adalytics intentionally and willfully published false, misleading, disparaging, and defamatory statements that specifically refer to DoubleVerify and are understood as referring to DoubleVerify.

106.    Adalytics' publication of false, misleading, disparaging, and defamatory statements was calculated to cause damage to DoubleVerify in its lawful business.

107.    Adalytics' publication of false, misleading, disparaging, and defamatory statements was done with the unlawful purpose of causing such damage and loss—including with the purpose of turning customers and industry partners away from DoubleVerify, and with the hope that Adalytics would gain the business of these customers and industry partners.

108.    Adalytics lacked any right or justifiable cause to do so—constituting malice.

109.    Adalytics' false, misleading, disparaging, and defamatory statements directly and proximately injured DoubleVerify, causing harm to existing relationships with customers and industry partners and negatively impacting DoubleVerify Holdings Inc.'s stock price, and resulting in pecuniary damages, including expenses from the measures reasonably necessary to counteract the publication's harmful impact, as well as the loss of goodwill and reputational injury.

110.    Adalytics' false, misleading, disparaging, and defamatory statements continue to directly and proximately cause pecuniary damages to accrue as DoubleVerify continues to incur expenses from the measures it continues to take that are reasonably necessary to counteract the publication's harmful impact.

111.    By reason of the foregoing, Adalytics is liable in an amount to be determined at trial, plus interest.

### COUNT 5: UNFAIR COMPETITION
### (MARYLAND COMMON LAW)

112.    DoubleVerify incorporates paragraphs 1 to 70 by reference as if fully set forth herein.

113.    Adalytics has engaged in a pattern of conduct that, taken as a whole, constitutes unfair competition with DoubleVerify.  This is evidenced by Adalytics' pattern of fraud, deceit, trickery and unfair methods described in the preceding paragraphs—including Adalytics' public dissemination of false metrics, its mischaracterization of DoubleVerify's practices, and its targeting of DoubleVerify's customers using misinformation.

114.    Adalytics intended to commit the acts constituting unfair competition as described in the preceding paragraphs.

115.    As a result of Adalytics' actions, DoubleVerify's relationships with its customers have been damaged.

116.    By reason of the foregoing, Adalytics is liable in an amount to be determined at trial, plus interest.

## JURY DEMAND

DoubleVerify demands a trial by jury.

## PRAYER FOR RELIEF

**WHEREFORE**, DoubleVerify respectfully requests that the Court enter judgment in its favor and against Adalytics as follows:

A.    Awarding compensatory damages against Adalytics, in favor of DoubleVerify, for all losses and damages suffered as a result of its wrongdoing as alleged herein, including disgorgement of Adalytics' ill-gotten profits, together with pre-judgment and post-judgment interest thereon, at the maximum rates allowed by law;

B.    Awarding punitive damages against Adalytics, in favor of DoubleVerify, in an amount to be determined at trial;

C.    Awarding DoubleVerify its reasonable costs and expenses incurred in this action, including a reasonable allowance of fees for its attorneys and experts;

D.    Granting DoubleVerify such other and further relief as the Court deems just and proper; and

E.    An order requiring Adalytics to retract its false statements and engage in corrective advertising.

Dated: May 12, 2025
Washington, District of Columbia

Respectfully submitted,

By: */s/ Kwame J. Manley*
Kwame J. Manley (MSBA 1012170015)
Bradley J. Bondi (*pro hac vice* forthcoming)
Ronald K. Anguas Jr. (*pro hac vice* forthcoming)
**PAUL HASTINGS LLP**
2050 M St. NW
Washington, DC 20036
Phone: (202) 551-1700
Facsimile: (202) 551-0201
kwamemanley@paulhastings.com
bradbondi@paulhastings.com
ronaldanguas@paulhastings.com

D. Scott Carlton (*pro hac vice* forthcoming)
**PAUL HASTINGS LLP**
515 S. Flower St.
Los Angeles, CA 90071
Phone: (213) 683-6000
Facsimile: (213) 627-0705
scottcarlton@paulhastings.com

***Attorneys for Plaintiffs DoubleVerify
Holdings Inc. and DoubleVerify Inc.***