## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

DOUBLEVERIFY HOLDINGS INC. and
DOUBLEVERIFY INC.,

        Plaintiffs,

    v.

ADALYTICS RESEARCH, LLC,

        Defendant.

No. 8:25-cv-01535-TDC

---

## DEFENDANT ADALYTICS RESEARCH, LLC'S MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION TO DISMISS THE COMPLAINT UNDER FED. R. CIV. P. 12(B)(6)

Alison B. Schary (#18687)
Chelsea T. Kelly (#31561)
Marietta Catsambas (#31794)
DAVIS WRIGHT TREMAINE LLP
1301 K Street NW
Suite 500 East
Washington, D.C. 20005
(202) 973-4248
alisonschary@dwt.com
chelseakelly@dwt.com
mariettacatsambas@dwt.com


*Attorneys for Defendant*
*Adalytics Research, LLC*

# **TABLE OF CONTENTS**

**Page**

I.      INTRODUCTION ................................................................................................ 1

II.     STATEMENT OF FACTS ................................................................................. 2

        A.      The Parties and the Ad Tech Industry.................................................... 2

        B.      DoubleVerify Attempts to Preemptively Discredit Adalytics' Research .............. 4

        C.      The Report .......................................................................................... 5

        D.      Public Response to the Report .............................................................. 8

        E.      Plaintiffs File This Lawsuit.................................................................. 8

III.    ARGUMENT ...................................................................................................... 9

        A.      DoubleVerify Fails to State a Claim for Defamation. ........................... 9

                1.      DoubleVerify Fails to Plead Defamation by Implication ......... 10

                2.      Adalytics' Analysis Is Constitutionally Protected Opinion ...... 11

                3.      Plaintiffs Cannot Plausibly Plead That Adalytics Acted with Actual Malice ........................................................................ 13

                        a.      DoubleVerify Is At Least a Limited-Purpose Public Figure ........ 14

                        b.      The Complaint Fails to Plausibly Plead Actual Malice ............... 15

                4.      Assorted Subsidiary Quotes in the Complaint Are Not "Of and Concerning" DoubleVerify and/or Not False or Defamatory .................. 19

        B.      DoubleVerify Fails to State a Claim for False Advertising Under the Lanham Act.......................................................................................... 19

                1.      The Report is not a "commercial advertisement" ..................... 20

                2.      Plaintiffs fail to allege the other elements of a false-advertising claim.................................................................... 25

        C.      DoubleVerify's Remaining State Tort Claims Also Fail as a Matter of Law. .............................................................................................. 27

IV.     CONCLUSION.................................................................................................. 30

# TABLE OF AUTHORITIES

**Page(s)**

**Federal Cases**

*Agbapuruanwu v. NBC Subsidiary (WRC-TVC, LLC)*,
   821 F. App'x 234 (4th Cir. 2020) ............................................................10

*Agora, Inc. v. Axxess, Inc.*,
   90 F. Supp. 2d 697 (D. Md. 2000), *aff'd*, 11 F. App'x 99 (4th Cir. 2001) ..............................10

*Allen v. Beirich*,
   2021 WL 2911736 (4th Cir. July 12, 2021)..........................................27

*Arpaio v. Zucker*,
   414 F. Supp. 3d 84 (D.D.C. 2019) ........................................................16

*Arthur v. Offit*,
   2010 WL 883745 (E.D. Va. Mar. 10, 2010) ..........................................12

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009)..........................................................................9, 15

*Bell Atl. Corp. v. Twombly*,
   550 U.S. 544 (2007)..........................................................................9, 15

*Biospherics, Inc. v. Forbes, Inc.*,
   151 F.3d 180 (4th Cir. 1998) ................................................................13

*Blankenship v. NBCUniversal, LLC*,
   60 F.4th 744 (4th Cir. 2023) ...........................................................17, 18

*Bolger v. Youngs Drug Prod. Corp.*,
   463 U.S. 60 (1983)........................................................21, 22, 24, 25

*Bose Corp. v. Consumers Union of United States, Inc.*,
   466 U.S. 485 (1984)..............................................................................15

*Bracco Diagnostics, Inc. v. Amersham Health, Inc.*,
   627 F. Supp. 2d 384 (D.N.J. 2009) .......................................................22

*CACI Premier Tech., Inc. v. Rhodes*,
   536 F.3d 280 (4th Cir. 2008) ................................................................11

*Cambridge Title Co. v. Transamerica Title Ins. Co.*,
   817 F. Supp. 1263 (D. Md. 1992), *aff'd*, 989 F.2d 491 (4th Cir. 1993) ................................27

*Carr v. Forbes, Inc.*,
    259 F.3d 273 (4th Cir. 2001) .......................................................................14

*Chapin v. Knight-Ridder, Inc.*,
    993 F.2d 1087 (4th Cir. 1993) ....................................................................10

*Church Ekklasia Sozo Inc. v. CVS Health Corp.*,
    2022 WL 1572732 (W.D.N.C. Feb. 25, 2022) ...........................................26

*Church of Scientology Int'l v. Daniels*,
    992 F.2d 1329 (4th Cir. 1993) ....................................................................15

*City of Cincinnati v. Discovery Network, Inc.*,
    507 U.S. 410 (1993).....................................................................................20

*ClearOne Advantage, LLC v. Kersen*,
    756 F. Supp. 3d 30 (D. Md. 2024)...............................................................29

*Colossus Media, LLC v. Adalytics Rsch., LLC*,
    2025 WL 712986 (D. Md. Mar. 5, 2025).......................................18, 24, 25

*Crash Proof Ret., LLC v. Price*,
    533 F. Supp. 3d 227 (E.D. Pa. 2021) ..........................................................21

*Davis v. Avvo, Inc.*,
    345 F. Supp. 3d 534 (S.D.N.Y. 2018)..........................................................26

*De Simone v. VSL Pharms., Inc.*,
    36 F.4th 518 (4th Cir. 2022) .......................................................................20

*Design Res., Inc. v. Leather Indus. of Am.*,
    789 F.3d 495 (4th Cir. 2015) ......................................................................19

*Display Works, LLC v. Pinnacle Exhibits, Inc.*,
    2015 WL 7454084 (D. Md. Nov. 24, 2015) .................................................28

*Doe v. Blue Cross & Blue Shield of N. Carolina*,
    2024 WL 3346319 (W.D.N.C. July 9, 2024)..................................................3

*Exeltis USA Inc. v. First Databank, Inc.*,
    2017 WL 6539909 (N.D. Cal. Dec. 21, 2017)..............................................21

*Fairfax v. CBS Corp.*,
    2 F.4th 286 (4th Cir. 2021) .........................................................................16

*Farah v. Esquire Mag.*,
    736 F.3d 528 (D.C. Cir. 2013) ......................................................................9

*FedEx Ground Package Sys., Inc. v. Route Consultant, Inc.*,
    661 F. Supp. 3d 765 (M.D. Tenn. 2023), *aff'd*, 97 F.4th 444 (6th Cir. 2024) .........................26

*Fitzgerald v. Penthouse Int'l, Ltd.*,
    691 F.2d 666 (4th Cir. 1982) .................................................................................................14

*Food Lion, Inc. v. Cap. Cities/ABC, Inc.*,
    194 F.3d 505 (4th Cir. 1999) .................................................................................................27

*Fornshill v. Ruddy*,
    891 F. Supp. 1062 (D. Md. 1995), *aff'd*, 89 F.3d 828 (4th Cir. 1996) ....................................9

*Greater Balt. Ctr. for Pregnancy Concerns, Inc. v. Mayor & City Council of Balt.*,
    721 F.3d 264 (4th Cir. 2013) .................................................................................................21

*Handsome Brook Farm, LLC v. Humane Farm Animal Care, Inc.*
    700 F. App'x 251 (4th Cir. 2017).............................................................................................22

*Harte-Hanks Commc'ns, Inc. v. Connaughton*,
    491 U.S. 657 (1989).............................................................................................16, 18, 24

*Harvey v. Cable News Network, Inc.*,
    520 F. Supp. 3d 693 (D. Md. 2021) .........................................................................................16

*Hisp. Nat'l L. Enf't Ass'n NCR v. Prince George's Cnty.*,
    2020 WL 903205 (D. Md. Feb. 25, 2020) .................................................................................29

*Interphase Garment Sols., LLC v. Fox Television Stations, Inc.*,
    566 F. Supp. 2d 460 (D. Md. 2008)..........................................................................................30

*Jankovic v. Int'l Crisis Grp.*,
    822 F.3d 576 (D.C. Cir. 2016) .................................................................................................17

*Joseph Burstyn, Inc. v. Wilson*,
    343 U.S. 495 (1952)...............................................................................................................23

*Joseph v. Springer Nature*,
    2021 WL 1372952 (S.D.N.Y. Apr. 12, 2021), *aff'd sub nom. Joseph v. Springer Nature Am.,
    Inc.*, 2021 WL 6105369 (2d Cir. Dec. 21, 2021) ...................................................................12

*Ketonatural Pet Foods, Inc. v. Hill's Pet Nutrition, Inc.*,
    756 F. Supp. 3d 1128 (D. Kan. 2024) ....................................................................................21

*Lemelson v. Bloomberg L.P.*,
    903 F.3d 19 (1st Cir. 2018).....................................................................................................18

*Lexmark Int'l Inc. v. Static Control Components, Inc.*,
    572 U.S. 118 (2014)...............................................................................................................26

*Lokhova v. Halper*,
  995 F.3d 134 (4th Cir. 2021) ............................................................11

*Masson v. New Yorker Mag., Inc.*,
  501 U.S. 496 (1991).........................................................................15

*Mayfield v. Nat'l Ass'n for Stock Car Auto Racing, Inc.*,
  674 F.3d 369 (4th Cir. 2012) ............................................................16

*McCafferty v. Newsweek Media Grp., Ltd.*,
  955 F.3d 352 (3d Cir. 2020)..............................................................17

*Md. Shall Issue, Inc. v. Anne Arundel Cnty.*,
  662 F. Supp. 3d 557 (D. Md. 2023), *aff'd sub nom. Md. Shall Issue, Inc. v. Anne Arundel Cnty. Md.*, 91 F.4th 238 (4th Cir. 2024) ............................................................21

*Metro. Reg'l Info. Sys., Inc. v. Am. Home Realty Network, Inc.*,
  948 F. Supp. 2d 538 (D. Md. 2013).....................................................20

*Michel v. NYP Holdings, Inc.*,
  816 F.3d 686 (11th Cir. 2016) ...........................................................16

*Milkovich v. Lorain Journal Co.*,
  497 U.S. 1 (1990)..............................................................................11

*Montgomery v. Risen*,
  197 F. Supp. 3d 219 (D.D.C. 2016), *aff'd*, 875 F.3d 709 (D.C. Cir. 2017)............................17

*N.Y. Times Co. v. Sullivan*,
  376 U.S. 254 (1964).............................................................15, 17, 20

*Nat'l Life Ins. Co. v. Phillips Publ'g, Inc.*,
  793 F. Supp. 627 (D. Md. 1992).........................................14, 15, 19, 23

*Neurotron, Inc. v. Am. Ass'n of Electrodiagnostic Med.*,
  189 F. Supp. 2d 271 (D. Md. 2001), *aff'd*, 48 F. App'x 42 (4th Cir. 2002) ..........20, 21, 22, 28

*Nicosia v. De Rooy*,
  72 F. Supp. 2d 1093 (N.D. Cal. 1999) .................................................18

*NOVAGOLD Res., Inc. v. J Cap. Rsch. USA LLC*,
  2022 WL 900604 (E.D.N.Y. Mar. 28, 2022).........................................28

*Novick v. Hearst Corp.*,
  278 F. Supp. 277 (D. Md. 1968).........................................................28

*ONY, Inc. v. Cornerstone Therapeutics, Inc.*,
  720 F.3d 490 (2d Cir. 2013)........................................................ *passim*

v

*Oxycal Lab'ys, Inc. v. Jeffers*,
   909 F. Supp. 719 (S.D. Cal. 1995)................................................................22

*Pacira BioSciences, Inc. v. Am. Soc'y of Anesthesiologists, Inc.*,
   63 F.4th 240 (3d Cir. 2023) ..............................................................12, 13

*Pizza Hut, Inc. v. Papa John's Int'l, Inc.*,
   227 F.3d 489 (5th Cir. 2000) .................................................................25

*Resolute Forest Prods., Inc. v. Greenpeace Int'l*,
   302 F. Supp. 3d 1005 (N.D. Cal. 2017) ..................................................12

*Reuber v. Food Chem. News, Inc.*,
   925 F.2d 703 (4th Cir. 1991) .................................................................14

*S. Volkswagen, Inc. v. Centrix Fin., LLC*,
   357 F. Supp. 2d 837 (D. Md. 2005)........................................................29

*Savvy Rest, Inc. v. Sleeping Organic, LLC*,
   2019 WL 1607585 (W.D. Va. Apr. 15, 2019) .........................................26

*SCO Grp., Inc. v. Novell, Inc.*,
   2010 WL 413807 (D. Utah Jan. 28, 2010)...............................................28

*Secord v. Cockburn*,
   747 F. Supp. 779 (D.D.C. 1990) ............................................................17

*Shaukat v. Mid Atl. Pros., Inc.*,
   2021 WL 5743909 (D. Md. Nov. 30, 2021) ..............................................1

*St. Amant v. Thompson*,
   390 U.S. 727 (1968)..............................................................................15

*Tavoulareas v. Piro*,
   817 F.2d 762 (D.C. Cir. 1987) ...............................................................15

*Tobinick v. Novella*,
   848 F.3d 935 (11th Cir. 2017) ...............................................................23

*Total Recon Auto Ctr., LLC v. Allstate Ins. Co.*,
   705 F. Supp. 3d 510 (D. Md. 2023)........................................................28

*Tucker v. Fischbein*,
   237 F.3d 275 (3d Cir. 2001)...................................................................18

*Underwager v. Salter*,
   22 F.3d 730 (7th Cir. 1994) ...................................................................13

*Va. State Bd. of Pharmacy v. Va. Citizens Consumer Council, Inc.*,
    425 U.S. 748 (1976).............................................................................................20

*Verisign, Inc. v. XYZ.COM LLC*,
    848 F.3d 292 (4th Cir. 2017) ..............................................................................25

*View Point Med. Sys., LLC v. Athena Health, Inc.*,
    9 F. Supp. 3d 588 (D. Md. 2014).........................................................................30

*Watkins v. Cable News Network, Inc.*,
    2018 WL 1970747 (D. Md. Apr. 25, 2018)...........................................................16

*Worrell-Payne v. Gannett Co.*,
    2002 WL 31246121 (9th Cir. July 11, 2002).........................................................17

*Yantha v. Omni Childhood Ctr., Inc.*,
    2013 WL 5327516 (E.D.N.Y. Sept. 20, 2013) ......................................................27

*Young v. Dinesen*,
    2021 WL 3883880 (D. Md. Aug. 31, 2021) ............................................................9

**State Cases**

*Batson v. Shiflett*,
    325 Md. 684 (1992) .............................................................................................10

*Command Tech., Inc. v. Lockheed Martin Corp.*,
    2015 WL 6470277 (Md. Ct. Spec. App. Oct. 27, 2015).........................................29

Defendant Adalytics Research, LLC ("Adalytics") respectfully submits this memorandum of law in support of its motion to dismiss the Complaint ("Compl.") filed by Plaintiffs DoubleVerify Holdings Inc. and DoubleVerify Inc. (collectively, "DoubleVerify") for failure to state a claim under Fed. R. Civ. P. 12(b)(6).

## I.     INTRODUCTION

This lawsuit is a textbook effort by a large corporation to shut down First Amendment-protected discourse and criticism about its industry.  Corporate behemoth DoubleVerify is suing Adalytics—a single-member LLC offering digital media analytics—over an observational research report about "pre-bid" bot-detection services, which are offered by many ad-tech vendors.  Compl. 4 n.3.[1]  The Report meticulously supports its research with citations to public data and annotated screenshots illustrating its findings.  Among other things, the Report documents advertisements with code referencing "bot avoidance" services offered by multiple companies—including but not limited to DoubleVerify—that were served to bots.  Sen. Mark Warner cited the Report in letters to the FTC and Justice Department, and major media outlets covered its findings.

At first, DoubleVerify responded to the Report through its own press releases, engaging in a public dialogue.  But now it has filed a baseless lawsuit against Adalytics, asserting claims for defamation, false advertising, and related torts.  Tellingly, DoubleVerify does not question Adalytics' underlying data or even materially dispute its observations about that data as presented in the Report.  Instead, it claims the Report falsely implies that DoubleVerify's services are "ineffective" and that its customers "routinely pay" for advertising impressions served on bots.

---

[1] Pursuant to Section II.A.8 of the Case Management Order (ECF No. 16), a copy of the Report (cited in footnote 3 of the Complaint) is attached as Exhibit A to the Declaration of Alison Schary filed herewith.  The Court may consider the full Report in connection with this motion because it is incorporated by reference in the Complaint and is integral to DoubleVerify's claims.  *Shaukat v. Mid Atl. Pros., Inc.*, 2021 WL 5743909, at *2 (D. Md. Nov. 30, 2021).

Not only do these statements appear nowhere in the Report, they are expressly **rejected** by it: the Report's "caveats and limitations" section warns against using the Report to extrapolate precisely the type of broad, qualitative conclusions about individual vendors that DoubleVerify sues over.

DoubleVerify's defamation claim is antithetical to the First Amendment, which encourages more speech, not less, on important topics of public concern.  It also fails as a matter of law.  First, the allegedly defamatory implications are not reasonable based on the Report as a whole, and DoubleVerify does not plead that the Report "intended or endorsed" such implications, as required in this Circuit.  Second, to the extent DoubleVerify is challenging Adalytics' analysis of undisputedly authentic data, those assessments are constitutionally protected opinion.  As courts across the country have found, such debates are better resolved by scholarly research and public discourse, not litigated in courtrooms.  Third, DoubleVerify is at least a limited-purpose public figure, yet it fails to plausibly plead that Adalytics published the Report with constitutional actual malice.  Finally, the cherry-picked phrases that DoubleVerify claims are "defamatory" concern the industry as a whole—not DoubleVerify specifically—and/or lack defamatory meaning.

DoubleVerify's Lanham Act claim fares no better.  The Report is not commercial speech; it does not advocate for or against purchasing any product or service, and in fact warns readers **not** to use it for that purpose.  Nor can DoubleVerify satisfy the other elements of a false-advertising claim.  Finally, DoubleVerify's remaining tort claims fail along with its defamation claim, since they are based on the same alleged defamatory statements and alleged harm.

## II.    STATEMENT OF FACTS

### A.  The Parties and the Ad Tech Industry

Adalytics is a small company based in Maryland that provides data science and analytics services to advertisers.  Compl. ¶¶ 17, 42.  Adalytics works with advertisers to evaluate the effectiveness of their ad campaigns and assess whether their campaigns are meeting their goals

and standards.  The company also routinely publishes public-interest research reports on its website, based on its analysis of open-source data, to facilitate dialogue among industry stakeholders.  *Id.* ¶ 6; *see also id.* ¶ 42 n.11 (Adalytics is "well-known for its research, the fruit of often monthslong investigations").  Its research has been cited by academics, members of Congress, and major news outlets.[2]

Plaintiff DoubleVerify Holdings Inc. is a large publicly-traded advertising technology company, and Plaintiff DoubleVerify Inc. is its wholly-owned subsidiary.  *Id.* ¶ 15; *see also* ECF No. 2.  DoubleVerify claims to safeguard its customers from online advertising fraud, including by protecting them from being billed for advertising impressions served to non-human visitors—most commonly bots, also known as invalid traffic or "IVT."  Compl. ¶ 24.

When a user visits a webpage, the website's publisher sends out a request for bids to various demand-side platforms ("DSPs").  *Id.* ¶ 29.  DSPs allow advertisers to bid for impressions (*i.e.*, the right to display an advertisement), consistent with their overall advertising campaign objectives.  *Id.*  Advertisers analyze bid requests and place bids for the impression through the DSPs, which typically award the impression to the highest bidder.  *Id.* ¶ 30.

DoubleVerify offers two services intended to protect customers from charges for invalid impressions: "pre-bid" and "post-bid" solutions.  *Id.* ¶ 28.  For its ***pre-bid*** service, DoubleVerify claims to analyze bid requests to prevent its customers from bidding on impressions by invalid users.  *Id.* ¶ 31.  DoubleVerify contends this pre-bid service "prevents companies from bidding on, or being charged for, most IVT, including 99% of unwanted GIVT impressions."  However, it

---

[2] *See, e.g.*, Schary Decl. Exs. B, C, D.  The court may take judicial notice of these exhibits for the fact of their contents, including citations to Adalytics' research.  *See Doe v. Blue Cross & Blue Shield of N. Carolina*, 2024 WL 3346319, at *1 n.1 (W.D.N.C. July 9, 2024) ("Courts may take judicial notice of the coverage and existence of newspaper articles.").

concedes that some SIVT impressions "may not be caught at the pre-bid stage." *Id.* ¶¶ 31-32.[3] DoubleVerify's ***post-bid*** service allegedly detects IVT impressions after they occur. DoubleVerify claims that it removes GIVT impressions from billable reporting and identifies SIVT impressions to seek compensation from the seller. *Id.* ¶¶ 33-34. Some of DoubleVerify's customers use only its pre-bid or post-bid options, while others use both services. *Id.* ¶ 35. Adalytics does not compete with DoubleVerify in the sale of pre-bid services. *Id.* ¶ 33.

### B.    DoubleVerify Attempts to Preemptively Discredit Adalytics' Research

On January 3, 2025, DoubleVerify became aware that Adalytics was preparing a new report about pre-bid bot avoidance services in the ad industry. Compl. ¶ 7. On January 10, 2025, DoubleVerify "preemptively issued its own public statement" in an attempt to discredit Adalytics' anticipated report. *Id.* ¶¶ 7, 49; *see also* Schary Decl. Ex. E (the "Prebuttal").[4] The Prebuttal stated that Adalytics' forthcoming report would claim "verification vendors are regularly failing to catch non-human traffic, specifically 'benign bots,' … [or] 'GIVT.'" Schary Decl. Ex. E at 1. Yet the Prebuttal does not identify ***anything*** specifically incorrect in the anticipated Report. In particular, it does not dispute that its customers' ads may be served on GIVT (*i.e.*, declared bots), despite "pre-bid" protections; instead, it states that "industry standards" call for that traffic ultimately to be removed from reporting and not charged to the advertising client—a process that occurs ***post-bid***. Otherwise, the Prebuttal generally disparages Adalytics and promotes DoubleVerify's "[c]omprehensive [a]pproach [t]o [f]raud [p]revention." DoubleVerify notes that Adalytics "provides very limited post-bid measurement and does not offer pre-bid avoidance solutions." *Id.*

---

[3] Invalid traffic falls into two categories—general IVT or "GIVT" (*i.e.*, search engine crawlers, which declare themselves as bots) and sophisticated IVT or "SIVT" (*i.e.*, traffic that emulates a human user to avoid detection). GIVT "can serve legitimate purposes, such as to index websites for searching or to test internet performance." Compl. ¶¶ 25-27.

[4] The Prebuttal is cited and incorporated in the Complaint. Compl. ¶ 49; *see supra* n.1.

C.      **The Report**

On March 28, 2025, Adalytics published the Report on its website, titled "*On pre-bid bot detection and filtration - Are ad tech vendors serving US Government and Fortune 500 brands' digital ads to bots?*"  Compl. ¶¶ 8, 50; Schary Decl. Ex. A.  As the title indicates, the Report focused ***only*** on "pre-bid" (not "post-bid") services offered by various ad-tech vendors.

The Report begins by providing general industry background, explaining various terms and concepts used in the Report.  It notes that "bot traffic isn't necessarily good or bad . . . [s]ome bots are essential for useful services such as search engines and digital assistants."  Schary Decl. Ex. A at 8.  The Report surveys prior research about bot-avoidance services and the prevalence of invalid traffic, discusses industry standards, and documents how major vendors (including but not limited to DoubleVerify) describe their "pre-bid" services to customers.  *Id.* at 45-49.  It highlights letters from Congress in 2016 and 2018, asking the FTC to look into the negative impacts of digital ad fraud and "the inaction of major industry stakeholders in curbing these abuses."  *Id.* at 50.

Next, Adalytics lays out the Report's specific "research objectives," which it considered to be "in the public interest."  The Report sought to answer the following questions:

> 1.  Did any advertisers have their ads served to bots operating out of data center server farms?
>> a.  Did any US government or US military advertisers have their ads served to bots by ad tech vendors?
>> b.  Did any non-profit, NGO, or charity advertisers have their ads served to bots by ad tech vendors?
>
> 2.  Were any ads served to bots by vendors who made public claims about filtering out bot traffic before an ad impression was served?  If so, which vendors who made such public proclamations were observed serving ads to bots?

*Id.* at 50.  The Research Methodology details Adalytics' sources and methods for its observation and analysis of existing data generated by known bot operators.  *Id.*

The Report's research results are arranged into 10 subsections.  As it explains, Adalytics observed references to major ad-tech vendors (including but not limited to DoubleVerify) in the code of ads that were served on bots, suggesting that some of the ads were served to bots despite the fact that the advertisers appeared to be using these vendors' bot avoidance services.  *E.g.*, *id.* at 2 ("Many of these ads which were served to bots appear to be using various 'pre-bid' bot avoidance or filtration tools from vendors such as Integral Ad Science (IAS) and DoubleVerify.").  The Report's findings are illustrated with screenshots of documented source code.  *Id.* at 74, 143.



The Report discusses more than 20 companies, including both partners and competitors of DoubleVerify.  Only three of the 10 "research results" headings mention DoubleVerify.  In the second results section, the Report explains that "[m]any publishers which appear to employ the IAS[5] and DoubleVerify publisher optimization tools on their pages were observed serving ads to bots, including to declared bots operating out of known data center IP addresses."  *Id.* at 101-02.  The Report documents its findings with annotated screenshots, all of which come from two public datasets (HTTP Archive and URLScan) that are routinely used by computer scientists, cybersecurity researchers, academics, and other industry experts.  The Report also observes that

---

[5] IAS, a different ad-tech vendor, is not a party to this action.

"[h]undreds of major brands whose ads' source code include references to 'charge-allDoubleVerifyBotAvoidance' . . . appear to have had their ads served to bots in data centers[,]" documenting specific examples. *Id.* at 205 (including screenshot above showing a US Navy ad that was served on the URLScan.io bot, where the ad's source code included the text "charge-allDoubleVerifyBotAvoidance"). Finally, the Report observes that the source code of several brands' ads that were served on bots contained references to an AI company called Scibids, which was acquired by DoubleVerify in 2023. *Id.* at 219.

The Report concludes with a "Caveats and Limitations" section that expressly warns readers not to draw certain inferences from the observed results. For example, it states:

> This report makes no assertions about the intent behind certain media buying practices, and whether or not it was done with specific parties' authorization. This report makes no assertions or claims with regards to the quantitative magnitude of some of the phenomena observed in this study. This observational research study does not make any assertions regarding causality, provenance, intent, quantitative impact, or relative abundance.
>
> This study does not make any recommendations to media buyers with regards to whether or not to transact with specific ad vendors or with specific publishers. The study is intended solely to present a set of public observations, so that readers can come to their own conclusions and make their own informed decisions.

*Id.* at 279-80. The Report further cautions that readers "[s]hould not assume that because a given ad tech vendor or vendors transacted a given ad to a bot that those vendors are somehow responsible or 'at fault' for the ad being served to a bot"; instead, the observed data may result from "different stakeholder[s] in the media supply chain" acting on mistaken or limited information. *Id.* at 279.

Finally, the Report recognizes that it is "possible that brands were not charged for some of the ads served to bots[]" referenced in the Report. *Id.* at 289. But it notes that Adalytics' "analysis of data provided by advertisers in some cases suggests that the brands were in fact invoiced for ads served to bot traffic," and further notes that some advertisers are not provided with access to

granular impression data that would reveal if they were invoiced for ads served on bots.  *Id.* at 289-90.  The Report does not assert that any DoubleVerify customer was billed for any specific ad documented in the Report, or for any other ads served on bots.

> ### D.    Public Response to the Report

Shortly after the Report's publication, Sen. Warner issued a press release with letters to the Department of Justice and the Federal Trade Commission, asking them to investigate concerns "over continued prevalence of fraud in the digital advertising industry, highlighting how this fraud hurts U.S. Government [] customers, and therefore American taxpayers."[6]  These letters, linked in the press release, cite the Report as support, noting it "reveals that several federal agencies, such as the U.S. Army, U.S. Navy, [and others] . . . have had their advertisements served to easily-identifiable bots, rather than the intended human audiences since at least 2020."[7]  Media outlets, including *The Wall Street Journal*, also covered the Report and included DoubleVerify's comments from its Prebuttal.  Compl. ¶¶ 9, 12, 66-67.  DoubleVerify also responded to the Report directly, in four online statements.  Compl. ¶ 9 n.4 & n.5.

> ### E.    Plaintiffs File This Lawsuit

On May 12, 2025, DoubleVerify sued Adalytics for false advertising, defamation, tortious interference, and unfair competition.  The Complaint does not challenge any actual statements in the Report that are allegedly defamatory of DoubleVerify.  Instead, it challenges two allegedly defamatory *implications*: (1) "that DoubleVerify's services are ineffective" (Implication 1); and (2) "that DoubleVerify's customers routinely pay for advertising impressions that are served to

---

[6] *See* Schary Decl. Ex. B.  The Court may consider this document (and the documents cited in notes 7 and 8 *infra*) on this motion for the fact of its contents.  *See supra* n.2.
[7] *See* Schary Decl. Exs. F, G.

robotic agents ("bots") . . . rather than to genuine human consumers." (Implication 2).[8] DoubleVerify generally alleges reputational harm and an unspecified impact to its stock price. It does not identify any specific business or customers lost because of the Report. Compl. ¶ 69.

## III.    ARGUMENT

To survive a motion to dismiss under Rule 12(b)(6), plaintiffs must "set forth factual allegations that make their claims plausible." *Young v. Dinesen*, 2021 WL 3883880, at *1 (D. Md. Aug. 31, 2021); *see also Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (courts will grant a motion to dismiss where the complaint fails to "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A plaintiff may not simply "state, without foundation, that they believe they are entitled to some relief." *Young*, 2021 WL 3883880, at *1. Here, the Court should dismiss the Complaint in its entirety because DoubleVerify fails to state any plausible claim for relief.

### A.    DoubleVerify Fails to State a Claim for Defamation.

Rule 12(b)(6) is intended to weed out meritless claims, sparing the parties the expense of modern discovery. *Twombly*, 550 U.S. at 556-59. Such concerns are especially present in defamation cases, where forcing defendants to incur unnecessary costs defending ultimately meritless suits can chill speech. *See Fornshill v. Ruddy*, 891 F. Supp. 1062, 1074 (D. Md. 1995), *aff'd*, 89 F.3d 828 (4th Cir. 1996). Thus, "[s]ummary proceedings are essential in the First Amendment area because if a suit entails 'long and expensive litigation,' then the protective purpose of the First Amendment is thwarted even if the defendant ultimately prevails." *Farah v. Esquire Mag.*, 736 F.3d 528, 534 (D.C. Cir. 2013) (affirming dismissal of defamation claim).

---

[8] *E.g.*, Compl. ¶¶ 1, 13, 33, 51, 52 (Implication 1); *id.* ¶¶ 1, 13, 51, 56, 57 (Implication 2).

To plead defamation under Maryland law, a plaintiff must sufficiently allege: (1) that the defendant made a defamatory communication; (2) that the statement was false; (3) the defendant's requisite level of fault; and (4) that the plaintiff suffered harm. *Agora, Inc. v. Axxess, Inc.*, 90 F. Supp. 2d 697, 701 (D. Md. 2000), *aff'd*, 11 F. App'x 99 (4th Cir. 2001). The "threshold question" of whether a statement is reasonably capable of defamatory meaning is a legal question for the court. *Batson v. Shiflett*, 325 Md. 684, 723 (1992).

**1.      DoubleVerify Fails to Plead Defamation by Implication**

Where, as here, a plaintiff is alleging libel by implication, it "must make an especially rigorous showing": the challenged publication "must not only be reasonably read to impart the false innuendo, but it must also affirmatively suggest that the author intends or endorses the inference." *Chapin v. Knight-Ridder, Inc.*, 993 F.2d 1087, 1092-93, 1110 (4th Cir. 1993); *see also Agbapuruanwu v. NBC Subsidiary (WRC-TVC, LLC)*, 821 F. App'x 234, 241 (4th Cir. 2020). To make this determination, a court must evaluate the challenged language in the context of the "whole publication." *Batson*, 325 Md. at 723; *see also Chapin*, 993 F.2d at 1093.

DoubleVerify cannot satisfy *Chapin*'s "rigorous" requirement to show that the Report "intended or endorsed" either of its alleged implications. The Report does not assess the overall "effectiveness" of any service or vendor; it documents (undisputed) examples of advertisements in public data sets whose code references pre-bid services from various major ad-tech vendors. Likewise, the Report never states or implies that DoubleVerify customers were actually ***billed*** for specific ads that appear to have been served on bots; it makes the (undisputed) statement that it observed ads served on bots containing code referencing DoubleVerify. *See* Compl. ¶ 53. Notably, DoubleVerify admits that it cannot determine whether customers were charged in many of the instances documented in the Report because the records no longer exist—meaning it cannot even demonstrate that the alleged implication is false. *Id.* n.19.

Indeed, the Report expressly cautions readers ***against*** usings its observational research findings to assess any particular vendor's services.  For example, it explains:

- This study does not recommend or advise any media buyers to exclude or block specific vendors, intermediaries, or sellers from future ad buys. Each media buyer may wish to review their own ad buy records, their media buying requirements, and make their own informed decisions with regards to whether or not to continue to transact with any specific media vendor or intermediary.

- This study does not make any assertions with regards to quantitative impact. For example, this study does not quantify how many total ads were served via specific vendors to bots, or the absolute prevalence of bot traffic in digital advertising.

- Even if a vendor has correctly identified a user as a bot, sometimes other stakeholders may intentionally or inadvertently still authorize an ad to be served to that bot . . . [O]ne should not assume that because a given ad tech vendor or vendors transacted a given ad to a bot that those vendors are somehow responsible or 'at fault' for the ad being served to a bot.

Schary Decl. Ex. A at 279-81.

Given the Report's industry-wide scope and express disavowal of the very implications alleged here, DoubleVerify cannot show that the Report "intended or endorsed" these implications. *See Lokhova v. Halper*, 995 F.3d 134, 146 (4th Cir. 2021) (affirming dismissal of defamation-by-implication claim where the article at issue "disclaimed . . . [the defamatory] implication.").

### 2.    Adalytics' Analysis Is Constitutionally Protected Opinion

Even if the Report did support these two challenged implications, DoubleVerify's claim still fails because these are expressions of opinion protected by the First Amendment.  *See Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 20 (1990) ("[A] statement of opinion relating to matters of public concern which does not contain a provably false factual connotation will receive full constitutional protection.").  Whether a statement is protected opinion is a question of law for the Court.  *CACI Premier Tech., Inc. v. Rhodes*, 536 F.3d 280, 293 (4th Cir. 2008).

Courts have repeatedly dismissed defamation claims challenging scientific and technical analyses, research design, and interpretations of data, finding that these are protected opinion and "not the sort of thing that courts or juries resolve in the context of a defamation action." *Arthur v. Offit*, 2010 WL 883745, at *6 (E.D. Va. Mar. 10, 2010) (dismissing defamation claim over statement accusing plaintiff of lying about the efficacy of vaccines). *See, e.g., Joseph v. Springer Nature*, 2021 WL 1372952, at *7 (S.D.N.Y. Apr. 12, 2021) (scientific disagreements, including "whether certain material supports the conclusion" drawn, dismissed because "the Court has no business solving" such debates), *aff'd sub nom. Joseph v. Springer Nature Am., Inc.*, 2021 WL 6105369 (2d Cir. Dec. 21, 2021); *Resolute Forest Prods., Inc. v. Greenpeace Int'l*, 302 F. Supp. 3d 1005, 1021 (N.D. Cal. 2017) ("The academy, and not the courthouse, is the appropriate place to resolve scientific disagreements of this kind."). "To conclude otherwise would risk 'chilling' the natural development of scientific research and discourse." *Pacira BioSciences, Inc. v. Am. Soc'y of Anesthesiologists, Inc.*, 63 F.4th 240, 248 (3d Cir. 2023) (affirming dismissal of trade libel claims arising from "critiques about the Articles' data and methodology" as protected opinion).

For example, in *ONY, Inc. v. Cornerstone Therapeutics, Inc.*, 720 F.3d 490 (2d Cir. 2013), the plaintiff alleged that a medical journal article comparing the relative effectiveness of its treatment and a competitor's was both defamatory and actionable under the Lanham Act. *ONY* alleged the article's methodology was flawed because it omitted certain data; it claimed incorporating that data would show that any differences in patient outcomes were driven by factors other than the relative effectiveness of the two treatments. *Id.* at 492-95. The Second Circuit rejected the plaintiff's claim, explaining that "courts are ill-equipped to undertake to referee such controversies." *Id.* at 497. Instead, it explained that "[w]hen the conclusions reached by experiments are presented alongside an accurate description of the data taken into account and the

methods used, the validity of the authors' conclusions may be assessed on their face by other members of the relevant discipline or specialty." *Id.* at 497-98.

Here, as in *ONY*, Plaintiffs do not challenge the authenticity of the underlying data or the code that Adalytics observed and documented in the Report; they disagree with Adalytics' (alleged) inferences and interpretations of that data. For example, Plaintiffs do not dispute that Adalytics observed code containing the phrase "charge-allDoubleVerifyBotAvoidance" in some brands' ads that were served on bots. *See* Compl. ¶ 53. Nor do they dispute that the presence of such source code may indicate that certain publishers who had their ads served on bots "appear to utilize DoubleVerify's publisher optimization tools." *Id.* Instead, DoubleVerify claims the code string may appear "for a host of different reasons" and may involve customers that were only using DoubleVerify's post-bid solutions. *Id.* ¶ 58. But the Report acknowledges that ad-tech vendors are not necessarily "at fault" when an ad is served on a bot and notes that the code may come from a different stakeholder in the process. Schary Decl. Ex. A at 281. Even without that clarification, Adalytics' interpretation and analysis of non-fraudulent data is protected opinion. *See Biospherics, Inc. v. Forbes, Inc.*, 151 F.3d 180, 185-86 (4th Cir. 1998); *see also Pacira BioSciences, Inc.*, 63 F.4th at 248.

In sum, DoubleVerify's initial instinct—to publish its own response to the Report—is exactly the sort of debate and discussion that the First Amendment encourages, and that Adalytics welcomes. Disputes over research design, inferences from data, or scientific and technical conclusions are best debated in the court of scientific and public opinion through "[m]ore papers, more discussion, better data, and more satisfactory models"—not by bringing defamation claims. *Underwager v. Salter*, 22 F.3d 730, 736 (7th Cir. 1994).

### 3.  Plaintiffs Cannot Plausibly Plead That Adalytics Acted with Actual Malice

DoubleVerify's defamation claim also fails on another independent ground: it is a public

figure, yet it fails to plausibly plead that Adalytics acted with actual malice.

### a.    DoubleVerify Is At Least a Limited-Purpose Public Figure

The Fourth Circuit uses a five-factor test to identify a limited-purpose public figure, asking whether:

> (1) the plaintiff had access to channels of effective communication; (2) the plaintiff voluntarily assumed a role of special prominence in a public controversy; (3) the plaintiff sought to influence the resolution or outcome of the controversy; (4) the controversy existed prior to the publication of the defamatory statements; and (5) the plaintiff retained public figure status at the time of the alleged defamation.

*Fitzgerald v. Penthouse Int'l, Ltd.*, 691 F.2d 666, 668 (4th Cir. 1982). The second and third factors are the "heart" of the test. *Carr v. Forbes, Inc.*, 259 F.3d 273, 280 (4th Cir. 2001).

Here, all five factors are met. First, DoubleVerify clearly has access to the "channels of effective communication"; the Complaint cites multiple press releases it issued about the Report, both before and after publication. *Id.* ¶ 69. *See, e.g.*, *Nat'l Life Ins. Co. v. Phillips Publ'g, Inc.*, 793 F. Supp. 627, 635-36 (D. Md. 1992) (insurance company was a public figure where it "sen[t] out a multitude of press releases"). Regarding the second and third factors, the Report clearly concerns a public controversy: it cites letters from members of Congress going as far back as 2016, urging the Federal Trade Commission and Justice Department to investigate digital advertising fraud and its impact on consumers and the economy, and surveys prior research about the prevalence of bot traffic and advertising fraud. Ex. A at 49. *Nat'l Life Ins. Co.*, 793 F. Supp. at 634 (holding that "the financial health of institutions that are regulated by the government" constitutes a public controversy). And DoubleVerify unquestionably entered and sought to influence that public controversy by issuing its public Prebuttal even before the Report's publication. Compl. ¶ 49. *See Reuber v. Food Chem. News, Inc.*, 925 F.2d 703, 710 (4th Cir. 1991) (plaintiff voluntarily entered controversy by writing a report and disseminating his views to

interested parties); *Nat'l Life Ins. Co.*, 793 F. Supp. at 638-39 (plaintiff voluntarily entered public controversy where it "engaged in a national advertising campaign extolling its financial strength").

The fourth and fifth factors are also satisfied.  The public controversy clearly existed prior to the Report's March 2025 publication, given that Senators Warner and Schumer were investigating these issues as early as 2016 and Plaintiffs published their Prebuttal in January 2025. And it is clear that Plaintiffs retained public-figure status when the Report was published; DoubleVerify remains a major public company with media access.  *See Nat'l Life Ins. Co.*, 793 F. Supp. at 640 (noting that "Plaintiff's efforts immediately after the first of the allegedly libelous articles clearly demonstrate the 'self help' opportunities available to" it).

### b.     The Complaint Fails to Plausibly Plead Actual Malice

As a public figure, DoubleVerify must plead facts sufficient to establish that Adalytics made each statement at issue "with knowledge that it was false or with reckless disregard of whether it was false or not."  *N.Y. Times Co. v. Sullivan*, 376 U.S. 254, 279-80 (1964).  By design, this is a "significant burden" for a public-figure plaintiff to overcome.  *Church of Scientology Int'l v. Daniels*, 992 F.2d 1329, 1334 (4th Cir. 1993).  It focuses solely on the defendant's state of mind "at the time of publication."  *Bose Corp. v. Consumers Union of United States, Inc.*, 466 U.S. 485, 512 (1984).  "Mere negligence does not suffice."  *Masson v. New Yorker Mag., Inc.*, 501 U.S. 496, 510 (1991).  Instead, "[t]here must be sufficient evidence to permit the conclusion that the defendant ***in fact*** entertained serious doubts as to the truth of his publication."  *St. Amant v. Thompson*, 390 U.S. 727, 731 (1968) (emphasis added).  A plaintiff "cannot show actual malice in the abstract; they must demonstrate actual malice *in conjunction* with a false defamatory statement."  *Tavoulareas v. Piro*, 817 F.2d 762, 794 (D.C. Cir. 1987) (en banc).

"[A]fter *Iqbal* and *Twombly,* every circuit that has considered the matter has applied the *Iqbal/Twombly* standard and held that a defamation suit may be dismissed for failure to state a

claim where the plaintiff has not pled facts sufficient to give rise to a reasonable inference of actual malice." *Michel v. NYP Holdings, Inc.*, 816 F.3d 686, 702 (11th Cir. 2016) (collecting cases). Courts regularly dismiss defamation claims at the 12(b)(6) stage for failure to plausibly plead facts that could demonstrate actual malice. *See, e.g.*, *Harvey v. Cable News Network, Inc.*, 520 F. Supp. 3d 693, 722 (D. Md. 2021) (dismissing defamation claim where plaintiff failed to plausibly plead actual malice); *Fairfax v. CBS Corp.*, 2 F.4th 286, 295 (4th Cir. 2021) (same); *Watkins v. Cable News Network, Inc.*, 2018 WL 1970747, at *6 n.11 (D. Md. Apr. 25, 2018) (same).

The Complaint is peppered with allegations criticizing Adalytics' business generally and the Report specifically. But none of these are sufficient to plead actual malice as a matter of law.

*First*, the Complaint's "formulaic recitation" of the actual malice standard (Compl. ¶ 85) carries no weight on this motion. *Mayfield v. Nat'l Ass'n for Stock Car Auto Racing, Inc.*, 674 F.3d 369, 378 (4th Cir. 2012); *see also Watkins*, 2018 WL 1970747, at *6 n.11 (dismissing claim where plaintiff's allegations were "mere recitations of the legal standard" for actual malice).

*Second*, allegations of a preconceived narrative, bias, or financial motive do not demonstrate actual malice. Accordingly, the Complaint's allegations that Adalytics had a "malicious playbook" (Compl. ¶ 43), that it published "hit pieces" that were "designed to harm" (*id*. ¶¶ 6, 68), that its research reports were intended "to promote its own platform" and "win new customers" (*id*. ¶¶ 6, 8)—and any similar assertions—do not plausibly plead actual malice. *See Harte-Hanks Commc'ns, Inc. v. Connaughton*, 491 U.S. 657, 667 (1989) ("[t]hat the defendant published the defamatory material in order to increase its profits [does not] suffice to prove actual malice."); *Mayfield*, 674 F.3d at 378 ("allegations that the [defendants] intended to harm [plaintiff] . . . simply do not suggest that Appellees knew their statements were false or that they were reckless with respect to their veracity."); *Arpaio v. Zucker*, 414 F. Supp. 3d 84, 92 (D.D.C. 2019) ("[T]he

16

motivations behind defendants' communications . . . do not impact whether defendants acted with actual malice as a matter of law.") (citation omitted).

*Third*, while DoubleVerify insists the Prebuttal "conclusively rebutted the substance of Adalytics' false statements" (Compl. ¶ 7), it does not identify ***any*** specific statement that was allegedly "rebutted" and then published in the Report.  Instead, the Prebuttal promotes DoubleVerify's business, describes general industry standards, and disparages Adalytics for offering only post-bid (not pre-bid) services.  This does not establish actual malice.  *See Worrell-Payne v. Gannett Co.*, 2002 WL 31246121, at *2 (9th Cir. July 11, 2002) (defendants' knowledge that plaintiff made "statements [] in her own defense at a press conference" and distributed packet of "corrective information" did not support finding of actual malice).  Complaints that Adalytics did not seek DoubleVerify's review and comment before publishing the Report are equally insufficient.  Compl. ¶ 85.  *See McCafferty v. Newsweek Media Grp., Ltd.*, 955 F.3d 352, 359-60 (3d Cir. 2020) (no actual malice where defendant did not seek comment from plaintiff); *Jankovic v. Int'l Crisis Grp.*, 822 F.3d 576, 594-95 (D.C. Cir. 2016) (failure to contact plaintiff for comment was "neither surprising nor required" and did not support actual malice).

*Fourth*, DoubleVerify's post-publication critiques of the Report are irrelevant to actual malice.  *See* Compl. ¶ 53.  "[I]t is hornbook libel law that post-publication events have no impact whatever on actual malice[,]" *Secord v. Cockburn*, 747 F. Supp. 779, 792 (D.D.C. 1990), since actual malice turns on the publisher's state of mind "at the time of the publication[,]" *Sullivan*, 376 U.S. at 286.  For the same reason, allegations that Adalytics failed to retract or correct the Report (*see* Compl. ¶ 64) are not "adequate evidence of malice for constitutional purposes." *Sullivan*, 376 U.S. at 286; *see also, e.g.*, *Montgomery v. Risen*, 197 F. Supp. 3d 219, 266 (D.D.C. 2016) (failure to retract did not show actual malice), *aff'd*, 875 F.3d 709 (D.C. Cir. 2017); *accord Blankenship*

*v. NBCUniversal, LLC*, 60 F.4th 744, 763 (4th Cir. 2023) ("[T]he lack of a retraction has little to no relevance in the actual malice inquiry.").

*Finally*, alleging that "Adalytics knew (or should have known) that its statements were false and misleading based on its claimed expertise in advertising technology" does not plead actual malice.  Compl. ¶ 85.  Generalized allegations of "expertise" do not establish actual malice. *See Nicosia v. De Rooy*, 72 F. Supp. 2d 1093, 1109 (N.D. Cal. 1999) (allegations that defendant was "a self-proclaimed expert" and "therefore … must have knowingly stated the falsehoods or at least been reckless with regard to the truth" insufficient to plead actual malice); *Lemelson v. Bloomberg L.P.*, 903 F.3d 19, 24 (1st Cir. 2018) ("[A] departure from industry standards, alone, is insufficient to allege actual malice, even if that departure is 'extreme.") (quoting *Harte-Hanks*, 491 U.S. at 688).  This is just another way of saying the defendant "*should have known*" a statement was false—but that is a negligence standard, not actual malice.  *See Blankenship*, 60 F.4th at 759 (assertion that a "reasonable person in [defendant's] position *should have known*" of alleged falsity did not satisfy actual malice standard, which "requires 'much more' than mere negligence.").

None of these allegations, individually or together, are sufficient to allege actual malice. *See Tucker v. Fischbein,* 237 F.3d 275, 286 (3d Cir. 2001) (plaintiff's 24 theories of actual malice, including that defendant engaged in "poor journalistic practices," had "a preconceived story-line," "did not follow . . . editorial guidelines[,]" and "failed to conduct a thorough investigation[], were not sufficient).[9]  Plaintiffs' defamation claim should be dismissed.

---

[9] In a suit by a different plaintiff over a different report, the court found actual malice sufficiently pled by alleging Adalytics "knew that its statements were false and/or misleading based on its expertise in advertising technology" and was "repeatedly informed . . . that the post was false" before publication.  *Colossus Media, LLC v. Adalytics Rsch., LLC*, 2025 WL 712986, at *10 (D. Md. Mar. 5, 2025).  As noted above, these allegations are not sufficient as a matter of law.

**4.     Assorted Subsidiary Quotes in the Complaint Are Not "Of and Concerning" DoubleVerify and/or Not False or Defamatory**

Finally, in support of its allegedly defamatory implications, DoubleVerify identifies various cherry-picked words or phrases that it alleges are false and defamatory. Read properly in context, none of these are actionable. For example, Plaintiffs allege that the Report "expressly states that 'advertisers were billed by ad tech vendors for ad impressions served to declared bots operating out of known data center server farms." Compl. ¶ 51. But there is no such "express statement" about billing in the Report; instead, the executive summary says that "impression level log file data and financial invoices *suggested that* advertisers were billed by ad tech vendors for ad impressions served to declared bots operating out of known data center server farms." Schary Decl. Ex. A at 1 (emphasis added). Nor is this statement "of and concerning" Double Verify specifically. *See Nat'l Life Ins. Co.*, 793 F. Supp. at 649 n.40 (allegedly defamatory statements not actionable where "Plaintiff [wa]s not singled out but [wa]s mentioned as part of a group, all of whom did not receive a favorable rating from S & P"). Other purported quotes in the Complaint are similarly not "of and concerning" DoubleVerify (e.g., Compl. ¶¶ 51, 57, 62) and/or not alleged to be false or defamatory (e.g., Compl. ¶¶ 33, 58, 51, 59).

**B.     DoubleVerify Fails to State a Claim for False Advertising Under the Lanham Act.**

To assert a false-advertising claim under the Lanham Act, a plaintiff must establish that:

> (1) *the defendant made a false or misleading description of fact or representation of fact* in a commercial advertisement about his own or another's product; (2) the misrepresentation is material, in that it is likely to influence the purchasing decision; (3) the misrepresentation actually deceives or has the tendency to deceive a substantial segment of its audience; (4) the defendant placed the false or misleading statement in interstate commerce; and (5) the plaintiff has been or is likely to be injured as a result of the misrepresentation, either by direct diversion of sales or by a lessening of goodwill associated with its products.

*Design Res., Inc. v. Leather Indus. of Am.*, 789 F.3d 495, 501 (4th Cir. 2015). "[F]ailure to establish any one" of these elements is "fatal" to the claim. *Id.* Courts must be "careful not to

permit overextension of the Lanham Act to intrude on First Amendment values[,]" and "free speech principles inform [courts'] interpretation of the Act." *ONY, Inc.*, 720 F.3d at 496.

DoubleVerify cannot plead a false-advertising claim over the Report for at least three reasons: (1) the Report is not a "commercial advertisement"; (2) the Report does not contain false or misleading representations of fact and therefore cannot deceive customers or negatively influence their purchasing decisions; and (3) the Complaint fails to allege a false-advertising injury, either for purposes of statutory standing or as an element of the cause of action.

### 1.    The Report is not a "commercial advertisement"

Under the Lanham Act, "commercial advertising or promotion" is "commercial speech . . . for the purpose of influencing consumers to buy goods or services." *De Simone v. VSL Pharms., Inc.*, 36 F.4th 518, 532 (4th Cir. 2022). Thus, it is a "threshold issue" that the challenged statements must be "commercial speech." *Metro. Reg'l Info. Sys., Inc. v. Am. Home Realty Network, Inc.*, 948 F. Supp. 2d 538, 553 (D. Md. 2013).

Core commercial speech is "speech which does 'no more than propose a commercial transaction,'" *Va. State Bd. of Pharmacy v. Va. Citizens Consumer Council, Inc.*, 425 U.S. 748, 762 (1976), or that is "related solely to the economic interests of the speaker and its audience," *Neurotron, Inc. v. Am. Ass'n of Electrodiagnostic Med.*, 189 F. Supp. 2d 271, 276 (D. Md. 2001), (quoting *City of Cincinnati v. Discovery Network, Inc.*, 507 U.S. 410, 422 (1993)), *aff'd*, 48 F. App'x 42 (4th Cir. 2002). The Report does not meet this definition of "core" commercial speech; it does not propose ***any*** commercial transaction, much less relate "solely" relate to one. Instead, the Report "communicate[s] information" and "expresse[s] opinion[s]" based on data analysis. *Sullivan*, 376 U.S. at 266 (paid editorial advertisement by clergy calling attention to civil rights abuses and seeking financial support for civil rights movements was not a "'commercial' advertisement"). "That a publisher compiles information, or even provides its own interpretation

20

of that information, for commercial actors is not enough to transform it into commercial speech." *Exeltis USA Inc. v. First Databank, Inc.*, 2017 WL 6539909, at \*7 (N.D. Cal. Dec. 21, 2017).

Beyond this "core" notion of commercial speech, the Supreme Court has identified three factors to assess whether speech should be construed as "commercial": (1) the speech is conceded to be an advertisement; (2) the speech refers to a specific product or service, and (3) the speaker has an economic motivation for the speech. *Md. Shall Issue, Inc. v. Anne Arundel Cnty.*, 662 F. Supp. 3d 557, 576 (D. Md. 2023) (citing *Bolger v. Youngs Drug Prod. Corp.*, 463 U.S. 60, 66-67 (1983)), *aff'd sub nom. Md. Shall Issue, Inc. v. Anne Arundel Cnty. Md.*, 91 F.4th 238 (4th Cir. 2024). No one factor is dispositive, but "[t]he combination of all these characteristics ... provides strong support for the . . . conclusion that [speech is] properly characterized as commercial speech." *Greater Balt. Ctr. for Pregnancy Concerns, Inc. v. Mayor & City Council of Balt.*, 721 F.3d 264, 285 (4th Cir. 2013) (quoting *Bolger*, 463 U.S. at 67).

Following these principles, courts around the country routinely hold that scientific and technical studies and research reports are not commercial advertisements actionable under the Lanham Act—even where that research may reflect negatively on a product or company. *See, e.g.*, *Neurotron*, 189 F. Supp. 2d at 276 (research analysis finding "information . . . is insufficient" as to whether plaintiff's medical device was effective not actionable under Lanham Act); *ONY, Inc.*, 720 F.3d at 497-98 (dismissing Lanham Act claim over study that found defendant's product to be more effective than plaintiff's competing product in treating respiratory disease); *Ketonatural Pet Foods, Inc. v. Hill's Pet Nutrition, Inc.*, 756 F. Supp. 3d 1128, 1145-49 (D. Kan. 2024) (dismissing Lanham Act claim over studies and public statements about health risks of grain-free pet food, even though statements may have had the effect of persuading customers to purchase defendant's products instead of plaintiff's); *Crash Proof Ret., LLC v. Price*, 533 F. Supp. 3d 227, 231 (E.D.

Pa. 2021) (dismissing Lanham Act claim by retirement-planning organization over article criticizing its investment strategy, where the article's purpose was to provide advice and educate consumers rather than advertise a product or service); *Bracco Diagnostics, Inc. v. Amersham Health, Inc.*, 627 F. Supp. 2d 384, 456-57 (D.N.J. 2009) (scientific articles in peer-reviewed journal, for which defendant sponsored research, were not commercial speech and therefore not actionable under Lanham Act); *Oxycal Lab'ys, Inc. v. Jeffers*, 909 F. Supp. 719, 722-26 (S.D. Cal. 1995) (book discussing scientific theories on elimination of cancer was not commercial speech under Lanham Act even though author had financial motive in selling it, and even though it condemned use of certain products while promoting the sale of others).

The same result is warranted here. *First*, DoubleVerify does not (and cannot) allege that the Report is "conceded" to be an advertisement. *Bolger*, 463 U.S. at 66. *Second*, it does not promote any specific product. Research and analytical reports do not constitute commercial speech where, as here, they "neither suggest[] that the reader buy any product or service, nor that they refrain from buying any product or service." *Neurotron, Inc.*, 189 F. Supp. 2d at 276 (rejecting Lanham Act claim over published review of medical device). In fact, the Report does exactly the opposite; it expressly states that "*[t]his study does not make any recommendations to media buyers with regards to whether or not to transact with specific ad vendors or with specific publishers.*"[10]   Schary Decl. Ex. A at 280 (emphasis added).

*Finally*, the fact that Adalytics is a for-profit company is not sufficient "economic motivation" to transform its observational research report into "commercial speech." *See, e.g.*,

---

[10] By contrast, the court in *Handsome Brook Farm, LLC v. Humane Farm Animal Care, Inc.* found that an email from a nonprofit offering "Certified Humane" accreditation, in which it notified retailers that a particular egg producer failed to meet its standards and urged them to consider "changing suppliers" to a producer certified by the organization, was commercial speech under *Bolger*.  700 F. App'x 251, 259-60 (4th Cir. 2017).

*Nat'l Life Ins. Co.*, 793 F. Supp. at 643-45 (investment analysis was not "commercial speech" based on its inclusion in promotional material seeking subscribers for financial newsletter); *Tobinick v. Novella*, 848 F.3d 935, 951-52 (11th Cir. 2017) (blog posts critiquing plaintiff's controversial medical claims were not actionable under Lanham Act, despite reference to defendant's medical practice); *see also Joseph Burstyn, Inc. v. Wilson*, 343 U.S. 495, 501 (1952) ("That books, newspapers, and magazines are published and sold for profit does not prevent them from being a form of expression whose liberty is safeguarded by the First Amendment.").

The decision in *National Life Insurance Company* is instructive. There, a financial news analyst published a newsletter including statements suggesting that the plaintiff insurance company was unsafe due to risky investments, which also appeared in promotional materials for the newsletter. 793 F. Supp. at 630. The court held that statements in the promotional materials, let alone in the newsletter itself, were not commercial speech. *Id.* at 645. The court rejected the plaintiff's argument that "the fact that the [] statements are lodged in a marketing letter proposing a commercial transaction, *i.e.*, buying of [the] newsletter, made the statements commercial[,]" because this "broad definitional sweep would, if applied without further thought, transform too much noncommercial speech into commercial statements." *Id.* at 643. It was not dispositive that the promotional materials referred to a specific product (the newsletter), nor was defendant's "economic motivation for sending the promotional materials to the potential subscribers . . . enough to turn the statements into commercial speech[]"—because the statements themselves were only an "incidental consequence" and bore "no direct relationship to the product, the newsletter, that is being sold." *Id.* at 643-44. As the court explained, "[i]f a profit motive could somehow strip communication of otherwise available constitutional protection, our cases from *New York Times* to *Hustler Magazine* . . . would be little more than empty vessels." *Id.* at 645 (quoting

23

*Harte-Hanks*, 491 U.S. at 667).

In *Colossus Media*, the court determined that the plaintiff in that case had sufficiently alleged the statements at issue from a different Adalytics report were "commercial speech" to defeat a Rule 12(b)(6) motion. *Colossus Media*, 2025 WL 712986, at *9. That decision is not binding here, nor should it be relied upon as persuasive. *First*, the *Colossus* court relied **only** on the plaintiff's allegations about the report and declined to consider the report itself. *Id.* at *6. Thus, the court did not and could not assess whether the challenged statements were core commercial speech, nor could it adequately consider the *Bolger* factors.[11] *Second*, the court appears to have misapprehended the first *Bolger* factor; rather than looking to whether the publication was "conceded" to be an ad, it cited the plaintiff's allegation that Adalytics publishes blog posts "for the purpose of winning new advertiser customers." *Id.* at *8. But this allegation goes to the third *Bolger* factor (economic motivation), not the first one.

*Finally*, the court erroneously found that Colossus had sufficiently alleged the speech was "economically motivated" under the third *Bolger* factor. Its determination appeared to rely primarily on a purported quote from a prior version of Adalytics' website: "Like many other companies, we release thought leadership on systemic issues affecting brands and their media investments . . . to . . . attract new clientele." *Id.* at *8. DoubleVerify's complaint includes the same quoted language, which it attributes to a February 19, 2025 version of Adalytics website taken from the Wayback Machine. Compl. ¶ 6 n.1. **But the phrase "attract new clientele" does not appear anywhere on the Wayback Machine URL cited in the Complaint.** Instead, the sentence reads: "Like many other companies, we release thought leadership on systemic issues affecting brands and their media investments **as part of our commitment to proactively protect**

---

[11] As explained *supra* n.1, this Court can and should consider the full Report on this motion.

*our advertiser clients*." Schary Decl. Ex. H at 1 (emphasis added). Otherwise, the *Colossus* court appears to have found "economic motivation" based on Adalytics' general status as a for-profit company whose customers "pay Adalytics for information." But as explained above, neither Adalytics' for-profit status nor the fact that it may attract customers by publishing high-quality analysis is sufficient to render all reports on its website "commercial speech."

In sum, the Report is not "core" commercial speech, nor should it be construed as commercial speech under the *Bolger* analysis. Because Plaintiff fails to allege this "threshold" requirement for a Lanham Act claim, this Court should dismiss this claim as a matter of law.

### 2.    Plaintiffs fail to allege the other elements of a false-advertising claim.

Even if DoubleVerify could plausibly allege that the Report is a commercial advertisement, the Complaint still fails to allege the other elements of a false-advertising claim. *First*, the Complaint does not identify an actionably false statement of fact because the challenged statements are protected opinion, as explained more fully in § III.A.2. "Essential to any claim under section 43(a) of the Lanham Act is a determination of whether the challenged statement is one of fact—actionable under section 43(a)—or one of general opinion—not actionable under section 43(a)." *Pizza Hut, Inc. v. Papa John's Int'l, Inc.*, 227 F.3d 489, 495-96 (5th Cir. 2000); *accord Verisign, Inc. v. XYZ.COM LLC*, 848 F.3d 292, 302 (4th Cir. 2017) ("[I]n order to be false in any way cognizable under the Lanham Act, a statement must also be one of fact—that is, a specific and measurable claim, capable of being proved false or of being reasonably interpreted as a statement of objective fact." (internal quotation marks and citation omitted)). Disputes over research design, inferences from data, or scientific conclusions are not matters for the court but rather for a "trial of ideas [that] plays out in the pages of peer-reviewed journals, [where] the scientific public sits as the jury." *ONY, Inc.*, 720 F.3d at 497. Where, as here, a research report draws inferences from *undisputed* underlying data, those inferences are protected opinion. And because it makes no

misrepresentations or false statements of fact, the Report cannot deceive customers or negatively influence purchasing decisions. *See, e.g.*, *FedEx Ground Package Sys., Inc. v. Route Consultant, Inc.*, 661 F. Supp. 3d 765, 782 (M.D. Tenn. 2023), ("The extent to which something is false or misleading bears on how likely it is to deceive, and how likely a statement is to deceive bears on how likely it is to cause harm."), *aff'd*, 97 F.4th 444 (6th Cir. 2024).

*Second*, the Complaint fails to sufficiently allege a false-advertising injury. "To invoke the Lanham Act's cause of action for false advertising, a plaintiff must plead (and ultimately prove) (1) an injury to a commercial interest in sales or business reputation (2) that was proximately caused by the defendant's representations." *Savvy Rest, Inc. v. Sleeping Organic, LLC*, 2019 WL 1607585, at *2 (W.D. Va. Apr. 15, 2019) (quoting *Lexmark Int'l Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 128 (2014) (internal quotation marks omitted)). Often characterized as a statutory standing requirement, the proximate causation/injury requirement is nonetheless "an element of the cause of action under the statute . . . [that] must be adequately alleged at the pleading stage in order for the case to proceed." *Lexmark*, 572 U.S. at 134 n.6.

While Plaintiffs allege they received "calls" from customers regarding the effectiveness of DoubleVerify's services, Compl. ¶ 79, they do not allege any specific lost customer, lost business opportunity, or other pecuniary harm. *See, e.g.*, *Davis v. Avvo, Inc.*, 345 F. Supp. 3d 534, 544 (S.D.N.Y. 2018) (dismissing Lanham Act claim where plaintiff did not plead facts showing that consumers relied on challenged statements, thereby failing to allege that conduct caused harm). The conclusory allegation that "Adalytics' false and misleading descriptions of fact have directly caused and will continue to cause the loss of goodwill and the loss of business and prospective customers and industry partners who, but for Adalytics' actions, would continue or begin to do business or otherwise associate with DoubleVerify" does not suffice. Compl. ¶ 80. *See Church*

*Ekklasia Sozo Inc. v. CVS Health Corp.*, 2022 WL 1572732, at *8 (W.D.N.C. Feb. 25, 2022) (failure to plead Lanham Act false-advertising claim where "[t]he Complaint lacks any allegations that [plaintiffs] have lost a single patient or otherwise suffered a single dollar in economic harm— let alone any allegations connecting any such damage to statements attributed to [defendant]").

**C.    DoubleVerify's Remaining State Tort Claims Also Fail as a Matter of Law.**

Plaintiffs' remaining state tort claims (injurious falsehood, tortious interference, and unfair competition) arise from the same allegations as their defamation claim: *i.e.*, that they suffered reputational harm from Adalytics' publication of the challenged statements. *See* Compl. ¶¶ 91, 105, 113. But plaintiffs "may not bypass the strictures of the First Amendment . . . by seeking publication damages for non-defamation tort claims." *Allen v. Beirich*, 2021 WL 2911736, at *4 (4th Cir. July 12, 2021) (citation omitted). Where a public-figure plaintiff "seek[s] damages resulting from speech covered by the First Amendment, the plaintiff must satisfy the proof standard of *New York Times*." *Food Lion, Inc. v. Cap. Cities/ABC, Inc.*, 194 F.3d 505, 523 (4th Cir. 1999).

Because Plaintiffs failed to plausibly plead that the challenged statements were published with actual malice, *supra* § III.A.3, their tag-along tort claims premised on the same statements must also be dismissed. *See, e.g.*, *Allen*, 2021 WL 2911736, at *4 (dismissing tortious interference and defamation claims over same statements); *Cambridge Title Co. v. Transamerica Title Ins. Co.*, 817 F. Supp. 1263, 1277 (D. Md. 1992) (same for injurious falsehood), *aff'd*, 989 F.2d 491 (4th Cir. 1993); *Yantha v. Omni Childhood Ctr., Inc.*, 2013 WL 5327516, at *7 n.3 (E.D.N.Y. Sept. 20, 2013) (same for unfair competition).

Plaintiffs also fail to allege the elements of each claim:

**Injurious Falsehood.** To state a claim for injurious falsehood under Maryland law, DoubleVerify must allege that Adalytics published (1) a known falsehood about its business, (2) with actual malice, (3) that played a "material and substantial part in inducing others not to

27

deal with [DoubleVerify]," causing DoubleVerify to suffer "special damage[s]." *Display Works, LLC v. Pinnacle Exhibits, Inc.*, 2015 WL 7454084, at *3 (D. Md. Nov. 24, 2015) (dismissing injurious falsehood claim for failure to plead special damages); *see also Neurotron, Inc.*, 189 F. Supp. 2d at 277 (dismissing injurious falsehood claim under *New York Times*).

In addition to Plaintiffs' failure to plead actual malice, *see supra* § III.A.3, the Complaint also fails to plead special damages. "Allegations of special damages, where required, must be stated with particularity, including either the loss of particular customers by name or a general diminution of business and extrinsic facts showing that such special damages were the natural and direct result of the false publication." *Novick v. Hearst Corp.*, 278 F. Supp. 277, 279 n.2 (D. Md. 1968); *see also Display Works*, 2015 WL 7454084, at *4 (dismissing injurious falsehood claim for failure to plead special damages with sufficient particularity, as required by Fed. R. Civ. P. 9(g)). Here, Plaintiffs do not identify ***a single customer*** who allegedly declined to do business with DoubleVerify because of the Report or any actual, pecuniary losses suffered. Vague allegations that the Report "may cause DoubleVerify to lose current and prospective customers and industry partners" (Compl. ¶ 97) do not satisfy the pleading standard. *See, e.g., Total Recon Auto Ctr., LLC v. Allstate Ins. Co.*, 705 F. Supp. 3d 510, 527 (D. Md. 2023) (plaintiff did not plead special damages where it identified a single negative customer review online). Nor does a temporary diminution in stock price (*see* Compl. ¶ 95) constitute special damages. *See, e.g., NOVAGOLD Res., Inc. v. J Cap. Rsch. USA LLC*, 2022 WL 900604, at *11 (E.D.N.Y. Mar. 28, 2022) ("Plaintiff's allegations that its stock price declined do not constitute special damages."); *SCO Grp., Inc. v. Novell, Inc.*, 2010 WL 413807, at *6 (D. Utah Jan. 28, 2010) ("[D]ecline in stock price is not an appropriate claim for special damages."). Plaintiffs' injurious falsehood claim should be dismissed.

**Unfair Competition**.  "Under Maryland law, the tort of unfair competition is founded on the premise that 'no one . . . is justified in damaging or jeopardizing another's business by fraud, deceit, trickery or unfair methods of any sort.'"  *ClearOne Advantage, LLC v. Kersen*, 756 F. Supp. 3d 30, 43 (D. Md. 2024) (quotation omitted).  While the tort is defined broadly under Maryland law, "unfair competition is not a 'fallback tort' that can save [a plaintiff] from its failure to establish tortious interference" or any other tort claim.  *Command Tech., Inc. v. Lockheed Martin Corp.*, 2015 WL 6470277, at *8 (Md. Ct. Spec. App. Oct. 27, 2015).  Here, Plaintiffs allege that Adalytics' "unfair methods" are simply its publication of the same challenged statements in its defamation claim.  Compl. ¶ 113.  Because these statements are not actionable and the Report is protected by the First Amendment, its publication is not an "unfair method[]."  *See S. Volkswagen, Inc. v. Centrix Fin., LLC*, 357 F. Supp. 2d 837, 853 (D. Md. 2005) (dismissing unfair competition claim that was "tethered to" plaintiff's nonactionable antitrust claim, alleging the same underlying conduct as defendant's "unfair methods").  The unfair competition claim should be dismissed.

**Tortious Interference with Business Relations.**  To state a claim for tortious interference with business relations, DoubleVerify must allege: "(1) intentional and willful acts; (2) calculated to cause damage to the plaintiffs in their lawful business; (3) done with the unlawful purpose to cause such damage and loss, without right or justifiable cause on the part of the defendants (which constitutes malice); and (4) actual damage and resulting loss."  *Hisp. Nat'l L. Enf't Ass'n NCR v. Prince George's Cnty.*, 2020 WL 903205, at *9 (D. Md. Feb. 25, 2020).  The claim "must include 'conduct that is independently wrongful or unlawful, quite apart from its effect on the plaintiff's business relationships,'" such as "defamation, injurious falsehood or other fraud."  *Id.* at *10. Here, DoubleVerify's failure to allege any independently wrongful act—since it fails to state a

claim for false advertising, defamation, injurious falsehood, or unfair competition—dooms its tortious interference claim too.

DoubleVerify also fails to identify any specific customer relationship that was both targeted and destroyed by Adalytics. "It is insufficient to allege malicious intent generally"; instead, "the plaintiff must show that the defendant specifically intended to interfere with its business relations." *Interphase Garment Sols., LLC v. Fox Television Stations, Inc.*, 566 F. Supp. 2d 460, 465 (D. Md. 2008). And that conduct must be "directed at" an existing or prospective business relationship—not a mere "incidental effect" of the challenged conduct. *Id.* "[T]he plaintiff must prove that the defendant's wrongful or unlawful act caused the destruction of the business relationship which was the target of the interference." *View Point Med. Sys., LLC v. Athena Health, Inc.*, 9 F. Supp. 3d 588, 615 (D. Md. 2014). Yet DoubleVerify fails to identify a single existing or prospective customer who was targeted by Adalytics and declined to do business with DoubleVerify as a result of the Report. *See* Compl. ¶¶ 107, 109. Its tortious interference claim should be dismissed.

## IV.    CONCLUSION

For the foregoing reasons, the Court should dismiss the Complaint with prejudice.

Dated:  September 4, 2025

Respectfully submitted,

/s/ Alison B. Schary
Alison B. Schary (#18687)
Chelsea T. Kelly (#31561)
Marietta Catsambas (#31794)
Davis Wright Tremaine LLP
1301 K Street NW, Suite 500 East
Washington, D.C. 20005
(202) 973-4248
alisonschary@dwt.com
chelseakelly@dwt.com
mariettacatsambas@dwt.com

*Attorneys for Defendant*