# UNITED STATES DISTRICT COURT
## DISTRICT OF MARYLAND

DOUBLEVERIFY HOLDINGS, INC. and
DOUBLEVERIFY, INC.,

    Plaintiffs,

    v.

ADALYTICS RESEARCH, LLC,

    Defendant.

Civil Action No. 25-1535-TDC

## MEMORANDUM OPINION

Plaintiffs DoubleVerify Holdings, Inc. and DoubleVerify, Inc. (collectively, "DoubleVerify") have filed this civil action against Defendant Adalytics Research, LLC ("Adalytics"), in which DoubleVerify alleges false advertising in violation of the Lanham Act, 15 U.S.C. § 1125(a), defamation, and other state common law claims arising from Adalytics's publication of a report relating to services provided by DoubleVerify and other companies to online advertisers. Adalytics has filed a Motion to Dismiss the Complaint, which is fully briefed. Upon review of the submitted materials, the Court finds that no hearing is necessary. *See* D. Md. Local R. 105.6. For the reasons set forth below, the Motion will be GRANTED IN PART and DENIED IN PART.

## BACKGROUND

The following relevant facts alleged in the Complaint are accepted as true for purposes of resolving the Motion to Dismiss.

## I.  DoubleVerify

DoubleVerify is in the business of "helping brands, agencies, and publishers verify that their digital advertising investments are delivered as intended." Compl. ¶ 23, ECF No. 1. Its customers are companies that use online advertisements to promote their goods or services and, as relevant here, seek to ensure that their digital ads are viewed to the greatest extent possible by potential customers. Online ads are typically placed on websites through a high-speed, auction-like process. In that process, when a user visits a webpage, an intermediary called a "demand-side platform" collects "bids" from advertisers on how much they are willing to pay the publisher of the webpage for their ads to be displayed to that user while viewing that webpage. *Id.* ¶¶ 29–30. This auction-like process is thus known as the "pre-bid" stage of online advertising. *Id.* ¶ 31. If an advertiser's bid is accepted and its ad is displayed, or "served," to the webpage visitor, the advertiser is later billed by the publisher of the webpage for that view, known in the industry as an "impression." *Id.* ¶¶ 28–31, 34.

Under such a system, online advertisers retain DoubleVerify to avoid having their ads served to bots rather than to humans, and to avoid paying for such impressions if they do occur. Bot activity is referred to as invalid traffic ("IVT"), of which there are two types: general IVT ("GIVT") and sophisticated IVT ("SIVT"). GIVT consists of bot traffic that typically operates for a benign purpose, such as an automated crawler that visits websites in order to index them for a search engine, and can be routinely detected and filtered out of the bidding process to prevent ads from being served to such bots. In contrast, SIVT is more difficult to detect and filter out because it consists of active attempts to imitate human users, including for the purpose of defrauding online advertisers.

To prevent its customers from having their ads served to bots and from paying for views resulting from IVT, DoubleVerify offers two services, which it calls "solutions." *Id.* ¶ 33. First, at the pre-bid stage, prior to advertisers placing their bids, DoubleVerify offers a service in which it analyzes the data included with a request for a bid in order to prevent its customers from placing bids on IVT. According to DoubleVerify, although not all IVT, particularly SIVT, can be "detected or avoided" before bidding, its pre-bid service successfully filters out 99 percent of GIVT impressions at the pre-bid stage. *Id.* ¶¶ 31–32. Second, at the "post-serve" stage, that is, after its customers have had their ads served to webpage visitors, DoubleVerify offers a service that identifies and removes views resulting from GIVT from the counts of billable views, such that its customers are not billed for those impressions. *Id.* ¶ 34. It also notifies its customers about views resulting from SIVT so that they may then seek reimbursement from the publishers of the webpages that displayed the ads that resulted in the SIVT impressions. According to DoubleVerify, "[v]irtually all" of the IVT impressions not avoided through use of its pre-bid service are "effectively detected by DoubleVerify at the post-serve stage." *Id.* ¶ 37. DoubleVerify's customers may choose to use its pre-bid service, its post-serve service, or both.

## II.     Adalytics

According to the Complaint, Adalytics is an "'ad-tech' vendor" that "sells an ad transparency service that competes with DoubleVerify." *Id.* ¶ 6. DoubleVerify asserts that Adalytics publishes reports on its website in order to publicize its own platform and services to online advertisers, some of whom are DoubleVerify's existing or prospective customers. DoubleVerify alleges that to promote its own business, Adalytics has used a "malicious playbook" of defamatory publications to target other companies, including Colossus SSP and Google, and is now doing the same against DoubleVerify. *Id.* ¶ 43.

In December 2024, Adalytics circulated a draft report to certain media outlets, one of which shared some of its substance with DoubleVerify on January 3, 2025. One week later, on January 10, 2025, DoubleVerify preemptively published an article on its own website to respond to what it considered to be misrepresentations and inaccurate claims relating to DoubleVerify that it expected to appear in the report.

### A. The Report

On March 28, 2025, Adalytics published an electronic document that it referred to as a "report," entitled "On pre-bid bot detection and filtration - Are ad tech vendors serving US Government and Fortune 500 brands' digital ads to bots?" ("the Report"). *Id.* ¶ 50. The Report began by providing background information on the definition, prevalence, and financial impact of IVT, discussing industry standards for IVT detection, and describing the pre-bid services offered by three companies: HUMAN Security, Integral Ad Science ("IAS"), and DoubleVerify. As to DoubleVerify, the Report stated that it "offers pre-bid targeting solutions, which block before an impression is purchased" and "helps brands . . . by preventing their bidding on auctions misaligned with their ad delivery standards." Report at 45–46, Mot. Dismiss Ex. A, ECF No. 26-3. It also quoted extensively from DoubleVerify's website, including DoubleVerify's claim that it "offers the most comprehensive and accurate pre-bid avoidance targeting available in the market." *Id.* at 46. The Report did not mention DoubleVerify's post-serve services.

The Report, which claimed to be the "largest analysis of declared bot traffic in the context of digital advertising," defined its research objectives as addressing two questions: (1) whether "advertisers have [had] their ads served to bots operating out of data center server farms," and (2) whether "any ads [were] served to bots by vendors who made public claims about filtering out bot traffic before an ad impression was served." *Id.* at 50–51. As for its methodology, the Report

4

stated that it used data obtained from three bot operators: the HTTP Archive, an anonymous web crawler vendor, and URLScan.io ("URLScan"). In relation to data from URLScan, the Report described an analysis of a URLScan database of screenshots of webpages visited by its bots, from which the Report identified "instances where various ad tech vendors served ads to bots" and analyzed the source code of ads included in the screenshots to identify references to HUMAN Security, IAS, and DoubleVerify. *Id.* at 65.

The Report made 10 primary findings, only three of which appear to be relevant to DoubleVerify's claims. Specifically, the Report found that "[m]any publishers which appear to employ the IAS and DoubleVerify publisher optimization tools on their pages were observed serving ads to bots, including to declared bots operating out of known data center IP addresses." *Id.* at 101–02. The Report also found that "[h]undreds of major brands whose ads' source code include[s] references to 'charge-allDoubleVerifyBotAvoidance' and code from DoubleVerify appear to have had their ads served to bots in data centers." *Id.* at 205. In another finding, the Report concluded that advertisers "whose ads appear to be mediated by DoubleVerify's Scibids AI technology," in that the ads' source code refers to "charge-allScibids," were served "to declared bots operating out of known data center IP addresses or to URLScan['s] bots." *Id.* at 223, 225.

In its conclusion, among other findings, the Report stated that "many advertisers and media agencies appear to be utilizing the services of ad verification vendors [IAS] and DoubleVerify, and having some of their ads served to bots," and that "[s]ome of these advertisers may be specifically paying for bot avoidance pre-bid segments." *Id.* at 285. The conclusion noted, however, that "[i]nterpreting the results of this observational study requires nuance and caution," and that "[o]ne should not assume that because a given ad tech vendor or vendors transacted a given ad to a bot that those vendors are somehow responsible or 'at fault' for the ad being served

5

to a bot." *Id.* at 279. The Report also cautioned that "[r]eaders should be discerning and careful not to conflate distinct sets of observations or draw inferences about causality, intent, quantitative impact, magnitude, or provenance," and that it "makes no assertions about" these issues. *Id.* at 280. Further, the Report stated that it "does not make any recommendations to media buyers with regards to whether or not to transact with specific ad vendors or with specific publishers" and is "intended solely to present a set of public observations, so that readers can come to their own conclusions and make their own informed decisions." *Id.* The Report concluded by advising that advertisers "may benefit from undertaking a closer review of their digital advertising." *Id.* at 290.

### B. Alleged False or Misleading Statements

In criticizing the Report, DoubleVerify broadly asserts that based on Adalytics's "willful blindness to post-serve detection and filtration," the Report "falsely and misleadingly portrays DoubleVerify's web advertisement verification and fraud protection services as ineffective, including by stating or clearly implying that DoubleVerify's customers are regularly billed for GIVT impressions." Compl. ¶¶ 51–52. In support of this claim, DoubleVerify points to a statement in the Report that "advertisers were billed by ad tech vendors for ad impressions served to declared bots operating out of known data center server farms." *Id.* ¶ 51. DoubleVerify also objects to the Report's "suggest[ion]" that DoubleVerify's pre-bid services did not work based on references to DoubleVerify in the source code on webpages from which ads were served to bots, because those impressions could have occurred in relation to DoubleVerify customers who did not use its pre-bid services. *Id.* ¶ 52. DoubleVerify asserts that, for all of the ad views, or impressions, cited in the Report that were ostensibly connected to DoubleVerify and that it was able to identify in its records, it confirmed that it had actually detected such impressions at the post-serve stage and either removed them from customers' billable counts or flagged them for reimbursement.

6

In addition, DoubleVerify asserts that the Report contains at least seven additional false or misleading statements or material omissions. First, the Report "dramatically exaggerates" the amount that advertisers pay for IVT impressions by improperly conflating GIVT and SIVT. *Id.* ¶ 55. Second, the Report implies that DoubleVerify's customers are "regularly charged" for advertising impressions that are known to be served to the URLScan bot, which the Report implies is a "declared" bot. *Id.* ¶ 57. Third, of the 115 screenshots of advertisements presented in the Report as having been served by DoubleVerify customers, at least 62 have no apparent connection to DoubleVerify. For the 53 screenshots that do show a connection to DoubleVerify, such as a reference to DoubleVerify in the source code, the Report presents them "misleadingly" as showing IVT impressions served by DoubleVerify's customers, even though references in the source code do not necessarily show that the advertisers were using DoubleVerify's pre-bid services. *Id.* ¶ 58. Fourth, DoubleVerify alleges that the Report "erroneously attributes" responsibility for the inclusion of "DoubleVerify" in a line of the source code to DoubleVerify rather than to the demand-side platform that generated the source code, and thereby suggested that DoubleVerify was responsible for ads that were delivered to bots. *Id.* ¶ 59. Fifth, the Report exclusively deals with pre-bid services and "feigns ignorance" of post-serve services in order to "claim and imply" that DoubleVerify's customers are "affected by rampant ad fraud." *Id.* ¶ 60. Sixth, the Report falsely deems "various practices" to constitute fraud, even though it acknowledges that it did not observe IVT impressions served to bots that were seeking to commit fraud. *Id.* ¶ 61. Seventh and finally, the Report "states and clearly implies that DoubleVerify is providing ineffective services to specific customers" and that they should "undertak[e] a closer review of their digital advertising." *Id.* ¶ 62.

DoubleVerify asserts that it has incurred reputational and financial harm from the Report. On the same day that the Report was published, the Wall Street Journal published an article entitled "Efforts to Weed Out Fake Users for Online Advertisers Fall Short," which stated that DoubleVerify "regularly miss[es] nonhuman traffic." *Id.* ¶ 66. The claims in the Report were also posted on the website AdExchanger and amplified by the Check My Ads Institute, a non-profit organization. Since the publication of the Report, DoubleVerify's stock price has fallen, and the company has had to expend employee time and resources to counter the Report, including by formulating public responses, engaging with media outlets, and responding to inquiries from customers, prospective customers, and stockholders.

### III. The Complaint

In the Complaint in this case, DoubleVerify alleges one federal statutory claim and four Maryland common law claims in the following numbered counts: (1) false advertising in violation of the Lanham Act, 15 U.S.C. § 1125(a); (2) defamation; (3) injurious falsehood; (4) tortious interference with business relations; and (5) unfair competition. DoubleVerify seeks compensatory damages, punitive damages, and injunctive relief to require Adalytics to retract its statements and issue corrective advertising.

## DISCUSSION

In its Motion, Adalytics seeks dismissal of all claims pursuant to Federal Rule of Civil Procedure 12(b)(6) on the grounds that the Complaint has failed to allege sufficient facts to support plausible claims for relief.

### I. Legal Standard

To defeat a motion to dismiss under Rule 12(b)(6), the complaint must allege enough facts to state a plausible claim for relief. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). A claim is

8

plausible when the facts pleaded allow "the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* Legal conclusions or conclusory statements do not suffice. *Id.* The Court must examine the complaint as a whole, consider the factual allegations in the complaint as true, and construe the factual allegations in the light most favorable to the plaintiff. *Albright v. Oliver*, 510 U.S. 266, 268 (1994); *Lambeth v. Bd. of Comm'rs of Davidson Cnty.*, 407 F.3d 266, 268 (4th Cir. 2005).

Typically, when deciding a motion to dismiss under Rule 12(b)(6), the Court considers only the complaint and any attached documents. *Sec'y of State for Defence v. Trimble Navigation Ltd.*, 484 F.3d 700, 705 (4th Cir. 2007). Courts are permitted, however, to consider documents attached to a motion to dismiss "when the document is integral to and explicitly relied on in the complaint, and when the plaintiffs do not challenge the document's authenticity." *Zak v. Chelsea Therapeutics Int'l, Ltd.*, 780 F.3d 597, 606–07 (4th Cir. 2015) (quoting *Am. Chiropractic Ass'n v. Trigon Healthcare, Inc.*, 367 F.3d 212, 234 (4th Cir. 2004)).

In this instance, Adalytics has attached to its Motion a declaration from its counsel and several exhibits, including a copy of the Report at issue in this case. Although the attached Report is undoubtedly integral to and explicitly relied on in the Complaint, DoubleVerify argues that the Court should not consider it because "there were draft versions" of the Report, "and it is unclear which version Adalytics attached." Opp'n at 12 n.3, ECF No. 27. Here, however, DoubleVerify cited the final version of the Report in the Complaint by providing in a footnote the web address at which it is located on the internet, *see* Compl. ¶ 8 & n.3, and Adalytics's counsel has submitted a sworn declaration stating that "Exhibit A is a true and correct copy" of the Report "which is cited in footnote 3 of the Complaint," Schary Decl. ¶ 2, ECF No. 26-2. Where DoubleVerify plainly has had access to the final Report and reviewed it in advance of filing the Complaint, but it has not

9

identified any discrepancies between the Report submitted by Adalytics and the final Report, the Court finds that there is no legitimate dispute about its authenticity and will consider the Report, which is integral to the Complaint, in ruling on the Motion.

## II. Lanham Act

In the Motion, Adalytics seeks dismissal of the Lanham Act false advertising claim in Count 1. As relevant here, the Lanham Act imposes civil liability upon:

> Any person who, on or in connection with any goods or services . . . uses in commerce any . . . false or misleading description of fact, or false or misleading representation of fact, which . . . in commercial advertising or promotion, misrepresents the nature, characteristics, [or] qualities . . . of his or her or another person's goods, services, or commercial activities.

15 U.S.C. § 1125(a)(1)(B). A plaintiff asserting a false advertising claim under the Lanham Act must plausibly allege five elements:

> (1) the defendant made a false or misleading description of fact or representation of fact in a commercial advertisement about his own or another's product;
>
> (2) the misrepresentation is material, in that it is likely to influence the purchasing decision;
>
> (3) the misrepresentation actually deceives or has the tendency to deceive a substantial segment of its audience;
>
> (4) the defendant placed the false or misleading statement in interstate commerce; and
>
> (5) the plaintiff has been or is likely to be injured as a result of the misrepresentation, either by direct diversion of sales or by a lessening of goodwill associated with its products.

*Scotts Co. v. United Indus. Corp.*, 315 F.3d 264, 272 (4th Cir. 2002) (quoting *Cashmere & Camel Hair Mfrs. Inst. v. Saks Fifth Ave.*, 284 F.3d 302, 310–11 (1st Cir. 2002)). Adalytics asserts that DoubleVerify has failed to allege sufficient facts to support the first and fifth elements.

Adalytics primarily seeks dismissal of Count 1 on the basis that the Report was not a "commercial advertisement or promotion" within the meaning of the Lanham Act. Mot. Dismiss at 20, ECF No. 26-1. Although the Lanham Act does not define the term "commercial advertising or promotion," the United States Court of Appeals for the Fourth Circuit has defined it as (1) "commercial speech"; (2) "for the purpose of influencing consumers to buy goods or services"; that is (3) "sufficiently disseminated to the relevant purchasing public to constitute advertising or promotion within that industry." *De Simone v. VSL Pharms., Inc.*, 36 F.4th 518, 532 (4th Cir. 2022) (referencing the first two requirements); *Handsome Brook Farm, LLC v. Humane Farm Animal Care, Inc.*, 700 F. App'x 251, 256–57 (4th Cir. 2017) (identifying all three requirements).

In considering whether the element of "commercial speech" has been met for purposes of a Lanham Act false advertising claim, courts have applied the analysis used to assess whether communications constitute "commercial speech" for purposes of protections under the First Amendment to the United States Constitution. *See Handsome Brook Farm*, 700 F. App'x at 257–58. These factors include (1) whether the message is economically motivated; (2) whether it promotes a specific product; and (3) whether it is an advertisement. *Bolger v. Youngs Drug Prods. Corp.*, 463 U.S. 60, 61, 66–68 & n.13 (1983) (in considering a First Amendment challenge to a statute that barred the "unsolicited advertisement" of contraceptives sent through the mail, holding that a pharmaceutical company's two "informational pamphlets" on family planning and venereal disease constituted commercial speech because while they included "discussions of important public issues," they were "conceded to be advertisements," they referred specifically to the company's brand of condoms, and the company was economically motivated to distribute them); *Greater Balt. Ctr. for Pregnancy Concerns, Inc. v. Mayor & City Council of Baltimore*, 721 F.3d 264, 285 (4th Cir. 2013) (finding that speech is more likely to be commercial when "the speech is

11

an advertisement," "the speech refer[s] to a specific product or service," and "the speaker ha[s] an economic motivation for the speech") (quoting *U.S. Healthcare, Inc. v. Blue Cross of Greater Phila.*, 898 F.2d 914, 933 (3d Cir. 1990))). As part of this analysis, a court may consider whether the communication is "placed in a commercial context" and is "directed at the providing of services rather than toward an exchange of ideas." *Handsome Brook Farm*, 700 F. App'x at 258 (quoting *Greater Balt. Ctr. for Pregnancy Concerns*, 721 F.3d at 286). While none of these factors is alone sufficient or necessary to render speech commercial, the "combination of *all* of these characteristics" lends "strong support" for the conclusion that the speech at issue is commercial. *Bolger*, 463 U.S. at 66–67 & n.14.

As to the first factor, whether the Report is economically motivated, the Complaint alleges that Adalytics sells an "ad transparency service that competes with DoubleVerify," that the Report was published on Adalytics's website, on which the company's services are also advertised, and that such reports are posted on the website "for marketing purposes." Compl. ¶¶ 6, 72. Although the Report reads more like an analysis of other products and related technology than a communication aimed at selling Adalytics's own goods or services, DoubleVerify asserts that Adalytics publishes research of this kind because it "uses its blog posts and articles to promote its own platform" and supports that claim by pointing to a February 2025 statement on Adalytics's website that it "release[s] thought leadership on systemic issues affecting brands and their media investments . . . to . . . attract new clientele." *Id.* ¶ 6 & n.1.

More specifically, the Complaint alleges an economic motivation for publishing the Report by asserting that Adalytics "intended to damage DoubleVerify's business and reputation for the purpose of gaining a competitive advantage—including efforts to sell Adalytics' services and win new business from customers of DoubleVerify." *Id.* ¶ 75. In particular, DoubleVerify alleges that

12

Adalytics has a "motive to disparage the efficacy of DoubleVerify's pre-bid solutions because DoubleVerify is a leader in the space, while Adalytics does not offer pre-bid services" and that the Report was "an attempt to make [Adalytics's] own offering appear more attractive by comparison, because Adalytics focuses on the post-serve stage only." *Id.* ¶ 33. Thus, although DoubleVerify has provided few specific facts to demonstrate that Adalytics in fact has a competing product, it has sufficiently alleged facts supporting the view that the Report was produced and disseminated for economic gain.

As to the second factor, whether the Report promotes a specific product, the Report contains no discussion, or even identification, of any of Adalytics's own products or services. It thus differs from the two informational pamphlets at issue in *Bolger*, one of which expressly promoted the company's Trojan-brand condoms and one of which identified the company as the distributor of that product. *Bolger*, 463 U.S. at 66 n.13. It also differs from the pharmaceutical company's press release at issue in *De Simone*, which was found to be commercial speech because it "emphasize[d]" that the company's drug was "available for purchase." *De Simone*, 36 F.4th at 532. Still, a company's lack of reference to its own product does not always mean that its speech is non-commercial. *See, e.g., Bolger*, 463 U.S. at 66 n.13.

As for the third factor, whether the communication is an advertisement, the Complaint generally alleges that the Report by its very existence promotes Adalytics, and that it was published on its website on which Adalytics's services are advertised. Where the Report does not reference Adalytics's services, generally or specifically, and in no way encourages the purchase of any good or service, the Court finds that this factor weighs against a finding of commercial speech. On the related consideration of whether the communication is "placed in a commercial context" and is "directed at the providing of services rather than toward an exchange of ideas," *Handsome Brook*

*Farm*, 700 F. App'x at 258 (quoting *Greater Balt. Ctr. for Pregnancy Concerns*, 721 F.3d at 286), although the Complaint fairly alleges that the Report was posted on its website in a commercial context, and it could implicitly be aimed at marketing Adalytics's services, it reads more as a dissemination or partial exchange of ideas about certain services and technology than as an effort to advertise Adalytics's services.

Although the factors relevant to the issue of commercial speech do not uniformly point in one direction, when the Court views the allegations in the light most favorable to the nonmoving party, as is required at this stage, it finds that the allegations provide sufficient support for such a claim where, as discussed above, the Report may be fairly construed as economically motivated, and it can be deemed implicitly to seek to influence others to consider Adalytics's services by providing information critical of competing companies such as DoubleVerify. *See* 15 U.S.C. § 1125(a)(1)(B) (stating that the Lanham Act may be violated through misrepresentations about the "nature, characteristics, [or] qualities" of another's "goods, services, or commercial activities"). In *Handsome Brook Farm*, the Fourth Circuit found that an email sent to grocery retailers by the defendant, a nonprofit organization that certifies eggs as humanely produced, constituted commercial speech where it reported on an audit it had conducted that raised questions about an egg producer's certifications of humane treatment and organic products and suggested that the recipients "reconsider changing suppliers." *Handsome Brook Farm*, 700 F. App'x at 254, 259–60. Here, the Report similarly described an analysis that resulted in findings critical of services provided by DoubleVerify and other comparable companies and advised that online advertisers "may benefit from undertaking a closer review of their digital advertising." Report at 290. Although *Handsome Brook Farm* presents a stronger case of commercial speech, including because the email was directly sent to businesses that might consider the certifier's services and

the message made reference to the defendant's certification process, it demonstrates that the Report could potentially constitute commercial speech where its focus was the dissemination of the results of an analysis critical of a competitor's product or service. *See Handsome Brook Farm*, 700 F. App'x at 254.

As for the second factor relating to commercial advertising or promotion, for the reasons discussed above, the allegations are sufficient to support the claim that the Report was issued "for the purpose of influencing consumers to buy goods or services." *De Simone*, 36 F.4th at 532. Finally, where the Complaint alleges that the publication of the Report affected DoubleVerify's stock price and led to "inbound calls from its customers regarding the effectiveness of DoubleVerify's services," Compl. ¶ 79, the allegations adequately show that the Report was "sufficiently disseminated to the relevant purchasing public to constitute advertising or promotion within that industry." *Handsome Brook Farm*, 700 F. App'x at 256. The Court therefore declines to grant the Motion as to Count 1 on this basis. The Court notes, however, that to succeed on this claim, DoubleVerify will need to present evidence to demonstrate the veracity of its allegations that Adalytics, in fact, issued the Report out of an economic motivation to promote its own products or services.

Adalytics's secondary arguments for dismissal of the Lanham Act claim also fail. First, in relation to the first element, Adalytics asserts that DoubleVerify has failed to identify a false statement actionable under the Lanham Act because the challenged statements are all protected opinions on scientific and technical matters. However, as discussed below in relation to the defamation claim, the Court finds that DoubleVerify has alleged statements that are actionable and arguably misleading, so the Lanham Act claim will not be dismissed on that basis. *See infra* part III.

15

Next, in relation to the fifth element, Adalytics asserts that DoubleVerify has failed to plead an injury cognizable under the Lanham Act because it does not allege "any specific lost customer, lost business opportunity, or other pecuniary harm." Mot. Dismiss at 26. As stated above, a Lanham Act false advertising claim requires that the plaintiff "has been or is likely to be injured as a result of the misrepresentation, either by direct diversion of sales or by a lessening of goodwill associated with its products." *Scotts Co.*, 315 F.3d at 272. Here, although DoubleVerify has not named a customer it has lost, it has alleged a lessening of goodwill in that the Report "caused damage to DoubleVerify's reputation and goodwill by clearly implying that DoubleVerify is engaged in fraudulent activity, and impeaching DoubleVerify's honesty, integrity, and core business principles." Compl. ¶ 70. As for pecuniary harm, DoubleVerify has alleged that the Report reduced its stock price and caused it to incur expenses in countering the Report. It has also fairly alleged, based in part on the fact that it received customer inquiries about the effectiveness of its services following the issuance of the Report, a likelihood of future reputational and pecuniary harm due to the Report. At this early stage, these allegations are sufficient to plead the injury element. The Motion will therefore be denied as to Count 1.

## III. Defamation

Adalytics also seeks dismissal of the defamation claim in Count 2. To establish a *prima facie* case of defamation under Maryland law, a plaintiff must establish that (1) the defendant made a defamatory statement to a third person, a requirement known as publication; (2) the statement was false; (3) the defendant was legally at fault in making the statement; and (4) the plaintiff thereby suffered harm. *Gohari v. Darvish*, 767 A.2d 321, 327 (Md. 2001). Under the first element, a defamatory statement is one "which tends to expose a person to public scorn, hatred, contempt or ridicule, thereby discouraging others in the community from having a good opinion of, or

16

associating with, that person." *Id.* (quoting *Rosenberg v. Helinski*, 616 A.2d 866, 871 (Md. 1992)). Under the second element, a statement is "false" if it is "not substantially correct." *Piscatelli v. Van Smith*, 35 A.3d 1140, 1147 (Md. 2012) (quoting *Batson v. Shiflett*, 602 A.2d 1191, 1212 (Md. 1992)). It is a question of law for the court whether a challenged statement, when the words at issue are given their ordinary meaning and read in the context of the whole publication and in light of extrinsic facts, "is reasonably capable of a defamatory interpretation." *Chesapeake Pub. Corp. v. Williams*, 661 A.2d 1169, 1174 (Md. 1995).

Generally, establishing the third element that a defendant is legally at fault requires a showing that, at a minimum, the party making the false statement acted negligently. *Hearst Corp. v. Hughes*, 466 A.2d 486, 490–92 (Md. 1983). However, when the plaintiff is a public figure, the standard is actual malice. *Capital-Gazette Newspapers, Inc. v. Stack*, 445 A.2d 1038, 1043 (Md. 1982). Actual malice is established by showing that the speaker made the statement with actual knowledge that it was false or with reckless disregard for its truth. *Hearst Corp.*, 466 A.2d at 490.

On the fourth element, harm is presumed if the statement was defamatory *per se* in that the injurious character of the statement is self-evident, and if the plaintiff can demonstrate actual malice. *Id.* at 493; *Samuels v. Tschechtelin*, 763 A.2d 209, 245 (Md. Ct. Spec. App. 2000). If the defamation is *per quod*, in that the factfinder must determine whether the statement is in fact defamatory, the plaintiff must show that the words caused actual damage. *Metromedia, Inc. v. Hillman*, 400 A.2d 1117, 1123 (Md. 1979); *Samuels*, 763 A.2d at 245.

In seeking dismissal, Adalytics asserts that DoubleVerify has not actually identified expressly false statements and instead seeks to demonstrate "defamation by implication." Mot. Dismiss at 10–11. Adalytics is correct that the vast majority of the statements that DoubleVerify claims are defamatory, and many if not all of the statements that DoubleVerify labels in its brief

17

as "express false statements of fact," Opp'n at 9, are not literally false. For example, DoubleVerify alleges that the Report falsely states that 49 of DoubleVerify's customers "have been serving ads on behalf of Fortune 500, United States Government, or other advertisers to bots." *Id.* (quoting Compl. ¶ 51). However, the Complaint elsewhere concedes that DoubleVerify's pre-bid services do not actually prevent all ads from being delivered to bots when it acknowledges that those pre-bid services filter out only "99% of unwanted GIVT impressions," and that "[n]ot all IVT impressions are able to be detected or avoided in the pre-bid stage." Compl. ¶¶ 31–32. DoubleVerify also acknowledges in the Complaint, based on a review of its records, that many of the specific IVT impressions described in the Report were addressed by DoubleVerify "at the post-serve stage." *Id.* ¶ 53 & n.19. Thus, DoubleVerify has not alleged facts showing that the assertion that some ads were, in fact, delivered to bots at the pre-bid stage is actually false.

As another example, DoubleVerify alleges in its brief that the Report falsely states that the URLScan bot, to which some ads were delivered, is a "declared bot in data centers." Opp'n at 10 (quoting Compl. ¶ 57). The Report itself, however, does not make that statement. Rather, under a heading stating that "[p]ublishers which appear to partner with" DoubleVerify and another company "were seen serving ads to declared bots in data centers," Report at 101, Adalytics presented in the following pages certain screenshots that appear to show that certain ads were served to the URLScan bot, which may imply that the URLScan bot is a declared bot, but the Report does not state that the URLScan bot is a declared bot and instead states, as DoubleVerify claims in the Complaint, that it "does not always declare" itself as a bot, and that it "would likely not be found on the . . . list of known bots." *Id.* at 63.

Nevertheless, drawing all reasonable inferences in favor of DoubleVerify, the Court finds that it has alleged a valid claim of defamation by implication. Under Maryland law, a "mere

inference, implication, or insinuation is as actionable as a positive assertion if the meaning is plain," and the "test is whether the words, taken in their common and ordinary meaning, in the sense in which they are generally used, are capable of defamatory construction." *Batson v. Shiflett*, 602 A.2d 1191, 1211 n.14 (Md. 1992). The "dispositive question" is not whether the statement constitutes the author's opinion but rather "whether a reasonable factfinder could conclude that the statements . . . imply an assertion" that is defamatory. *Snyder v. Phelps*, 580 F.3d 206, 219 (4th Cir. 2009) (quoting *Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 21 (1990)). Courts therefore "assess how an objective, reasonable reader would understand a challenged statement by focusing on the plain language of the statement and the context and general tenor of its message." *Id.*; *see, e.g.*, *Batson*, 602 A.2d at 1211 & n.14 (finding that a flyer stating that if one person was guilty of misuse of funds, then the plaintiff "may be" guilty as well was defamatory despite its conditional language because it "impl[ied] that [the plaintiff] misused donated food drive monies"). In addition, if "the expressed facts are literally true," a plaintiff pursuing a defamation-by-implication theory "must make an especially rigorous showing" and may prevail only if the challenged language "affirmatively suggest[s] that the author intends or endorses the inference." *Chapin v. Knight-Ridder, Inc.*, 993 F.2d 1087, 1091–93 & nn.4–6 (4th Cir. 1993) (in a case subject to Virginia law, applying First Amendment principles in relation to a defamation claim by a public figure about a matter of public concern).

In its most prominent claim, DoubleVerify argues that the Report was defamatory by implication in that it misleadingly implied that DoubleVerify's services are ineffective. In support of this claim, DoubleVerify alleges that the Report "clearly impl[ies] that DoubleVerify's customers are regularly billed for GIVT impressions," insinuates based on the presence of references to DoubleVerify in source code that "DoubleVerify's pre-bid solutions did not work,"

19

and focuses only on pre-bid solutions while "feign[ing] ignorance of the effectiveness of post-serve solutions to . . . imply that DoubleVerify customers are affected by rampant ad fraud." Compl. ¶¶ 51–52, 60. Indeed, the Report states that "impression level log file data and financial invoices suggested that advertisers were billed by ad tech vendors for ad impressions served to declared bots operating out of known data center server farms." Report at 1. Although this particular statement is not explicitly made in reference to DoubleVerify, where the Report prominently discusses its services, it is fairly implied to relate to DoubleVerify. The Complaint asserts that this statement and other related statements are defamatory because DoubleVerify actually deducts GIVT impressions from customers' billable counts and flags SIVT impressions to its customers so that they can seek reimbursement. The Report also states that "it appears to be possible to extract from the source code of the ad," including in relation to source code that mentioned DoubleVerify, "if a given brand appeared to be 'charged' (invoiced) for bot avoidance . . . services from a given vendor," *id.* at 74, which DoubleVerify claims to be defamatory by implication because "Adalytics willfully ignores that these impressions could have been served by DoubleVerify customers that do not even have its pre-bid solutions enabled." Compl. ¶ 52. This assertion provides only weak support for the defamation claim because DoubleVerify does not provide facts showing, for example, that any material number of its customers place online ads without enabling DoubleVerify's pre-bid solutions. However, at this early stage, where the Court must accept DoubleVerify's factual allegations as true and draw all reasonable inferences in its favor, the Court finds that DoubleVerify has plausibly alleged that the Report falsely implies to a reasonable reader that DoubleVerify's pre-bid bot detection services are not effective at detecting the displaying of online ads to bots, which in turn results in unwarranted charges to customers.

Adalytics argues that DoubleVerify has not plausibly alleged defamation by implication because it does not allege facts showing that Adalytics intended or endorsed the defamatory implications. *See Chapin*, 993 F.2d at 1092–93. It is not clear that the "especially rigorous showing" required by *Chapin* applies in this case, because *Chapin* applied heightened speech protections when a public figure sued a media defendant based on statements relating to matters of public concern, and in this case the parties dispute whether DoubleVerify is a public figure and whether the Report relates to a matter of public concern. *See id.* at 1091–92 & n.4. Nevertheless, even assuming without deciding that DoubleVerify must plead that Adalytics endorsed the defamatory implications, it has asserted that Adalytics has "claimed expertise in advertising technology," Compl. ¶ 85, and thus would understand that DoubleVerify's customers, in accordance with industry standards, would not be charged for pre-bid impressions served to bots once DoubleVerify's post-serve processes were run. DoubleVerify has also referenced its publication of a "pre-emptive article" two months before the Report's publication, in which it refuted Adalytics's claims, which thus put Adalytics on notice that its claims were defamatory by implication. *Id.* Finally, DoubleVerify alleges that Adalytics illustrated its intent to disseminate defamatory information based on the fact that it sent a draft version of the Report to certain media outlets but never requested any comment from DoubleVerify, which illustrated that its goal was to generate "negative media coverage" about DoubleVerify in order "to spark demand" for its own ad transparency platform. *Id.* Although DoubleVerify's allegations relating to intent are not overly compelling, at this early stage, and where the Court must view the allegations in the light most favorable to DoubleVerify, the Court finds that they are sufficient.

Adalytics's other counterarguments do not alter this conclusion. Although the inclusion of a disclaimer can justify dismissal of a defamation claim, it must specifically disclaim the allegedly

defamatory implication. *See Lokhova v. Halper*, 995 F.3d 134, 146 (4th Cir. 2021) (affirming the dismissal of a defamation claim where the article at issue "disclaimed that very implication" of inappropriate behavior on which the defamation claim was based by reporting the subject's denial of inappropriate behavior). Although the Report contains certain disclaimers, including that "[i]nterpreting the results of this observational study requires nuance and caution," and that "it can be difficult to determine or infer who was 'responsible' or made a 'decision' that resulted in an ad being served to a bot," Report at 279, these caveats do not directly and specifically disclaim all of the allegedly defamatory implications in the Report. In particular, they do not disclaim implications relating to whether DoubleVerify's customers were charged for IVT impressions.

Adalytics next contends that its statements in the Report are constitutionally protected opinions because they consist of "scientific and technical analyses, research design, and interpretations of data," challenges to which are "best debated in the court of scientific and public opinion . . . not by bringing defamation claims." Mot. Dismiss at 12–13. However, although Adalytics used some technical methods in the Report, it was published on the company's general website and was not a peer-reviewed scientific or technical journal article such as those at issue in cases cited by Adalytics on this point. *See, e.g., Pacira BioSciences, Inc. v. Am. Soc'y of Anesthesiologists, Inc.*, 63 F.4th 240, 248–49 (3d Cir. 2023) (holding that statements "made in a peer-reviewed journal for anesthesiology specialists," for which the relevant readers "are best positioned to identify opinions" and accept or reject them based on an individual evaluation of the facts, were nonactionable opinions for purposes of claims of trade libel under New Jersey law); *ONY, Inc. v. Cornerstone Therapeutics, Inc.*, 720 F.3d 490, 494, 498 (2d Cir. 2013) (holding that statements published in a peer-reviewed neonatology journal were "non-actionable scientific conclusions" for purposes of the Lanham Act and New York's common law tort of injurious

falsehood); *cf. G. W. Aru, LLC v. W. R. Grace & Co.-Conn.*, 761 F. Supp. 3d 827, 847 n.10 (D. Md. 2025) (in discussing a Lanham Act claim, distinguishing *ONY* on the grounds that, unlike in *ONY*, the defendant company's statements, though scientific in nature, were "not published in a peer-reviewed journal, but rather in a trade magazine and on its own website"). Therefore, the Court will not dismiss the defamation claim on this basis.

Finally, Adalytics asserts that the defamation claim fails because DoubleVerify is a public figure for purposes of this litigation and thus must allege facts showing that Adalytics acted with actual malice, but it has failed to do so. A defamatory statement is made with actual malice if made "with knowledge that it was false or with reckless disregard of whether it was false or not." *See Hearst Corp.*, 466 A.2d at 490 (quoting *New York Times Co. v. Sullivan*, 376 U.S. 254, 279–80 (1964)). The First Amendment prohibits "a public official from recovering damages for a defamatory falsehood relating to his official conduct" unless the official proves that the defendant made the statement with actual malice. *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 334 (1974) (quoting *New York Times*, 376 U.S. at 279–80). The same requirement applies when the plaintiff is a "public figure," including someone who "voluntarily injects himself or is drawn into a particular public controversy and thereby becomes a public figure for a limited range of issues." *Id.* at 335, 351. In such cases, the Fourth Circuit has set forth five elements that a defendant must establish to show that the plaintiff is a limited-purpose public figure such that the plaintiff must prove actual malice:

> (1) the plaintiff had access to channels of effective communication; (2) the plaintiff voluntarily assumed a role of special prominence in the public controversy; (3) the plaintiff sought to influence the resolution or outcome of the controversy; (4) the controversy existed prior to the publication of the defamatory statement; and (5) the plaintiff retained public-figure status at the time of the alleged defamation.

*Foretich v. Cap. Cities/ABC, Inc.*, 37 F.3d 1541, 1553 (4th Cir. 1994).

Assuming without deciding that DoubleVerify is at least a limited-purpose public figure for purposes of the defamation claim, the Court finds that DoubleVerify has alleged sufficient facts on the issue of actual malice. Most specifically, DoubleVerify has alleged that Adalytics was "on notice" of the false or misleading nature of statements in the Report based on DoubleVerify's preemptive article, such that it acted with at least reckless disregard for the falsity of its statements when it published the Report two months later. Compl. ¶ 49. As discussed above in relation to the issue of intent to engage in defamation by implication, DoubleVerify has also alleged that Adalytics had "claimed expertise in advertising technology" and thus would have known that its statements were false or misleading, and that its reckless disregard for the truth was further demonstrated by the fact that Adalytics sent a draft version of the Report to certain media outlets but never requested any comment from DoubleVerify. *Id.* ¶ 85. At this early stage of the case, the Court will not dismiss the defamation claim based on a failure to allege actual malice. The Motion will therefore be denied as to the defamation claim in Count 2.

## IV.     Injurious Falsehood

Adalytics seeks dismissal of the claim for injurious falsehood in Count 3. "Injurious falsehood, otherwise known as disparagement, is a false and injurious statement that discredits or detracts from the reputation of another's character, property, product, or business." *Springer v. Erie Ins. Exch.*, 94 A.3d 75, 79 n.5 (Md. 2014) (citation omitted). The tort "resembles that for defamation, but differs from it materially in the greater burden of proof resting on the plaintiff, and the necessity for special damage in all cases." *Horning v. Hardy*, 373 A.2d 1273, 1278 (Md. Ct. Spec. App. 1977). Specifically, the plaintiff "must prove in all cases that the publication has played a material and substantial part in inducing others not to deal with him, and that as a result he had suffered special damage." *Id.* Special damage is limited to "pecuniary loss directly or

24

immediately from the conduct of third persons," including pecuniary loss "from the impairment of vendibility or value by the disparagement and the expense of measures reasonably necessary to counteract the publication, including litigation to remove the doubt cast upon vendibility or value by the disparagement." *Rite Aid Corp. v. Lake Shore Invs.*, 471 A.2d 735, 742 (Md. 1984). "If an item of special damage is claimed, it must be specifically stated." Fed. R. Civ. P. 9(g). Here, although DoubleVerify does not specifically allege that it has lost certain customers, *see Total Recon Auto Ctr., LLC v. Allstate Ins. Co.*, 705 F. Supp. 3d 510, 527 (D. Md. 2023), it has alleged pecuniary harm in the form of expenses incurred when countering the publication of the Report. Therefore, it sufficiently alleges special damage and the Motion will be denied as to Count 3.

## V. Tortious Interference with Business Relations

Adalytics also seeks dismissal of the claim for tortious interference with business relations in Count 4. The elements of this cause of action are: (1) intentional and willful acts; (2) calculated to cause damage to the plaintiffs in their lawful business; (3) done with the unlawful purpose to cause such damage and loss, without right or justifiable cause on the part of the defendants (which constitutes malice); and (4) actual damage and resulting loss. *Kaser v. Fin. Prot. Mktg., Inc.*, 831 A.2d 49, 53 (Md. 2003). The Supreme Court of Maryland has stated that:

> [T]he two general types of tort actions for interference with business relationships are inducing the breach of an existing contract and, more broadly, maliciously or wrongfully interfering with economic relationships in the absence of a breach of contract. The principle underlying both forms of the tort is the same: under certain circumstances, a party is liable if he interferes with and damages another in his business or occupation.

*Nat. Design, Inc. v. Rouse Co.*, 485 A.2d 663, 674 (Md. 1984). Because this tort requires more than mere competition, a claim for intentional interference with business relations must include "conduct that is independently wrongful or unlawful, quite apart from its effect on the plaintiff's business relationships." *Alexander & Alexander Inc. v. B. Dixon Evander & Assocs., Inc.*, 650

25

A.2d 260, 271 (Md. 1994). Such wrongful or unlawful acts include "common law torts and violence or intimidation, defamation, injurious falsehood or other fraud, violation of criminal law, and the institution or threat of groundless civil suits or criminal prosecutions in bad faith." *Id.* (quoting *K & K Mgmt. v. Lee*, 557 A.2d 965, 979 (Md. 1989)).

Although Adalytics argues that DoubleVerify has failed to allege a wrongful or unlawful act that could support a tortious interference claim, where the Court has found that DoubleVerify has stated a claim for defamation, this argument fails. Adalytics also seeks dismissal because DoubleVerify has not alleged that Adalytics interfered with a specific existing contractual relationship or prospective business relationship. Even though DoubleVerify pursues only the type of tortious interference claim which does not require a breach of contract, *see Nat. Design, Inc.*, 485 A.2d at 674, such a claim still requires the plaintiff to "identify a possible future relationship which is likely to occur, absent the interference, with specificity." *Mixter v. Farmer*, 81 A.3d 631, 638 (Md. Ct. Spec. App. 2013) (quoting *Baron Fin. Corp. v. Natanzon*, 471 F. Supp. 2d 535, 546 (D. Md. 2006)). The Complaint does not identify a specific relationship affected by the Report. The Motion will therefore be granted as to Count 4.

## VI. Unfair Competition

Finally, Adalytics seeks dismissal of the claim for unfair competition in Count 5. Under Maryland law, this tort consists of "damaging or jeopardizing another's business by fraud, deceit, trickery or unfair methods of any sort." *Real Time Med. Sys., Inc. v. PointClickCare Techs., Inc.*, 131 F.4th 205, 225 (4th Cir. 2025) (quoting *Balt. Bedding Corp. v. Moses*, 34 A.2d 338, 342 (Md. 1943)). Adalytics contends that the Report's publication is not an unfair method because it is not defamatory. Where the Court has found that DoubleVerify's defamation claim may proceed, the Motion will be denied as to Count 5.

## CONCLUSION

For the foregoing reasons, the Motion to Dismiss will be GRANTED IN PART and DENIED IN PART. It will be granted in that Count 4 will be DISMISSED WITHOUT PREJUDICE. It will otherwise be denied. A separate Order shall issue.

Date: April 27, 2026

THEODORE D. CHUANG
United States District Judge